```
1              BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,        .
                                      .  Case Number 21-mj-17
4             Plaintiff,              .
                                      .
5         vs.                         .
                                      .
6    CLEVELAND GROVER MEREDITH, JR.,  .  January 14, 2021
                                      .  3:20 p.m.
7             Defendant.              .
     - - - - - - - - - - - - - - - -

8

9              PUBLIC TRANSCRIPT OF DETENTION HEARING
                    (SEALED PORTION REDACTED)
10           BEFORE THE HONORABLE G. MICHAEL HARVEY
                  UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Government:        AHMED BASET, AUSA
                                United States Attorney's Office
14                              555 Fourth Street Northwest
                                Washington, D.C. 20530
15

16   For the Defendant:         UBONG AKPAN, AFPD
                                Federal Public Defender's Office
17                              625 Indiana Avenue Northwest
                                Suite 550
18                              Washington, D.C. 20004

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                333 Constitution Avenue Northwest
22                              U.S. Courthouse, Room 4704-B
                                Washington, D.C. 20001
23                              202-354-3284

24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

(All participants present via telephone or video conference.)

THE COURTROOM DEPUTY:  Judge, we have case 21-mj-17, United States of America versus Cleveland Meredith, Junior. This is scheduled to be a continued detention hearing by video.

Will the parties please introduce themselves for the Court, beginning with the government.

MR. BASET:  Good afternoon, Your Honor.  Ahmed Baset on behalf of the United States.

THE COURT:  Good afternoon.

MS. AKPAN:  Good afternoon, Your Honor.  This is Ubong Akpan on behalf of Mr. Meredith.

THE COURT:  Good afternoon.

PRETRIAL SERVICES OFFICER:  And Christine Schuck with Pretrial Services.

THE COURT:  Good afternoon.

This matter has been scheduled for a detention hearing. Mr. Baset, are you ready to proceed?

MR. BASET:  Yes, Your Honor.

THE COURT:  Ms. Akpan, are you ready as well?

MS. AKPAN:  Yes, Your Honor.

THE COURT:  Okay.  Government, go right ahead.

MR. BASET:  Your Honor, would you like us to address the issues that were the subject of the briefs yesterday?

```
1              THE COURT:  Yes.  I mean, I have to rule on that
2     issue.  It's a threshold issue.  I think you should address
3     whatever arguments you want to make.  You can address the four
4     factors.  I have reviewed your filing.  I thank you for filing
5     that last night.
6              MR. BASET:  You're very welcome.
7         I do think that, Your Honor, the government has cited to a
8     few cases that support the notion that interstate communication
9     of threats is indeed a crime of violence.  There is force that
10    is being threatened with respect to injury.  And so we do
11    believe as a threshold matter that a detention hearing is
12    warranted.
13        And I am happy to further address the conditions as far as
14    the factors for whether or not he should be released if Your
15    Honor does rule that a hearing is appropriate.
16             THE COURT:  Okay.  Let me -- I'm happy to rule on that
17    threshold issue first.
18        Ms. Akpan, do you want to add anything, having reviewed the
19    government's brief?
20             MS. AKPAN:  Yes, Your Honor.  I just would like to --
21    I did not have the time to file a written reply, but I just
22    wanted to note for the record --
23             THE COURT:  Sure.
24             MS. AKPAN:  -- a response to the government's
25    briefing.
```

1    The government lays out three cases, the *Santoro* case which

2    we have already argued is not a crime of violence and is an

3    incorrect analysis.  Regarding the *United States v. Choudhry*

4    case that the government relies on, Your Honor, that's a 2013

5    case.  In that case the threat analysis was based on the

6    residual clause, and after that, the Supreme Court overruled

7    that in 2019.  So that case again is in 2013, again based on the

8    crime of violence based on the residual clause, and it was

9    invalidated by the Supreme Court and had already been

10   invalidated by the Supreme Court in *Johnson* and *Davis*.

11   Thirdly, Your Honor, the *Christy* case that the government

12   relies on, the way it reads it appears to be just a conclusory

13   statement regarding the threats charge as a crime of violence.

14   Your Honor, the government also cites to Mr. Meredith being

15   a flight risk.  We disagree with that.  I can go into those

16   factors as well.  The government states that he is a serious

17   risk of flight because he has no ties to this community.

18   THE COURT:  Ms. Akpan, let me just address the

19   threshold issue, because there is no reason to get to all these

20   factors unless I do rule in the government's favor, although I

21   will just skip to the conclusion.  I am going to rule in the

22   government's favor, but I do want to make a record basis for my

23   decision.  So bear with me for a few minutes, and I will put the

24   basis for my decision on the record, and you will have an

25   opportunity to respond to the four Bail Reform Act factors.

1    First, I do agree with Ms. Akpan that the Bail Reform Act

2  requires the government to first establish one of the grounds in

3  Section 3142(f) as a prerequisite to the Court considering

4  whether the defendant should be detained pretrial as a danger to

5  the community.  So it's not every case that the government can

6  walk into court and say that the individual is a danger.

7  Rather, what the individual's charged with must fall into one of

8  those 3142(f) categories, or some other issue with respect to

9  the defendant's criminal background can also make them

10  potentially eligible for detention.

11    Here, the defendant has no criminal record, and the only

12  basis that I can see on which the government could argue that he

13  is a danger or be eligible to argue that he is a danger is with

14  respect to the 18 U.S.C. 875(c) charge and whether or not that

15  is a crime of violence as that phrase is defined under the Bail

16  Reform Act.  Under 3142(f)(1)(A), it makes crime of violence

17  eligible for a detention hearing and a finding by the Court that

18  the defendant should not be released as a danger.

19    Ms. Akpan did make one additional argument, before I get to

20  her main argument, with respect to 3142(f)(1)(A) in that the 10

21  year or more condition not only modifies the act part of the

22  list of 3142(f)(1)(A) but also the crime of violence condition,

23  that is, that it is only crimes of violence that could be

24  subject to 10 or more years in terms of a sentence that would

25  qualify under that section of the statute.

1    I don't read it that way.  I think the most natural reading

2   of the 10 years or more condition that other courts have

3   found -- and that's at the end of the quoted list in Section

4   3142(f)(1)(A) -- is that the condition modifies only the last

5   category in the list, which is not pertinent here.

6    Stated another way, the 10 years or more condition at the

7   end of the list found in that is not a further narrowing of the

8   category of crimes of violence, the first category in that list.

9    Provided that the defendant is charged with a crime of

10   violence as that phrase is defined in the Bail Reform Act, he or

11   she is eligible for detention if the danger, regardless of

12   whether the offense is 10 years or more.  That is how I read the

13   statute.  There's any other number of courts that have read the

14   statute in the same way, including that *Santoro* case.

15    Nevertheless, the Court must also find that the defendant

16   has in fact been charged with a crime of violence as that phrase

17   is defined in the Bail Reform Act.  The Bail Reform Act defines

18   that phrase as any offense that has as an element of the offense

19   the use, attempted use, or threatened use of physical force

20   against the person or property of another.

21    There's also the residual clause, and Ms. Akpan is correct

22   that that clause has been deemed unconstitutional in other

23   contexts.  I don't rely upon it here.  I rely instead on the

24   elements clause, which I just described.

25    To make the decision under the categorical approach as

directed by the Supreme Court, the decision whether or not a
crime is in fact a crime of violence under that definition, the
Court is not to look at the facts underlying the charge at
issue, not look at what the defendant is actually alleged to
have done, but at the elements of the crime as the statute
defines them.  That is, you must look at whether the use of
physical force or violence or threatened use of such force is an
element of the crime.

Here, Section 875(c), the crime at issue that the defendant
is charged with, criminalizes the interstate communication of a
threat to injure the person or a threat to kidnap any person.
It's explained under the case law that a threat to injure
another is criminalized by Section 875(c) and would meet the
legal definition of a crime of violence.  Plainly it does in my
view, and a number of courts have so held, including the *Santoro*
case.  The government cites at least one other which I think is
applicable, the *Christy* case.  They cite as well to *United
States vs. Cain*, which is at 2020 Westlaw 1660058, Western
District of Washington case in 2020, as well as the *United
States v. Cooper*, which can be found at 2019 Westlaw 474 259454,
Federal District of Tennessee case from 2019, both of which
concluded that 875(c) is a crime of violence.

The defense raises a question, though, as to whether or not
the analysis in those cases is correct.  The question raised by
the defense is whether the statute by its own terms also

1   criminalizes a threat to kidnap any person and whether that

2   should change the analysis.

3        The defendant is right that under the categorical approach,

4   assuming that the statute is not divisible -- which is an issue

5   I'm not going to address here; I don't think I need to -- a

6   court must presume that the charge rests upon nothing more than

7   the least of the acts criminalized.

8        So although the government may not intend to prove that

9   Mr. Meredith threatened to kidnap anyone in this case, only that

10  he threatened to injure other people, I must under the

11  categorical approach nevertheless consider whether under this

12  statute a threat to kidnap any person meets the statutory

13  definition of a crime of violence.  If it does not, then there

14  is no basis to hold him.  It would not then qualify as a crime

15  of violence.

16       The defendant points to cases where courts have held that

17  kidnapping is not a crime of violence, I'm sure an odd

18  conclusion to many people, a layperson and perhaps attorneys

19  alike, but that's the *Jenkins* case.  There's a few others as

20  well, a Seventh Circuit case.  They came to that conclusion

21  because while kidnapping can be committed with the use of force,

22  it can also be committed without the use of force.  That is, a

23  person could be kidnapped under the law without their knowledge

24  through trickery or deception, which would be a nonviolent way

25  of committing kidnapping.

1          I would note that the D.C. Circuit has not addressed that

2     issue.  There are courts in other jurisdictions that have held

3     that kidnapping is a crime of violence.  For the parties, *In Re*

4     *Hull,* 979 F.3d at 339, a Fifth Circuit case, *United States v.*

5     *Ross*, 969 F.3d 829.  That's an Eighth Circuit case.  Both of

6     those cases are from 2020.  So there is a dispute in the case

7     law about whether or not kidnapping is a crime of violence or

8     not.

9          In any event, even were I to assume that kidnapping is not

10    a crime of violence because it can be committed without the use

11    of force, this is not a kidnapping case.  This is a threats

12    case.  And unlike with kidnapping, every definition of "threat"

13    or "threatened" that I have seen conveys the notion of the

14    intent to inflict harm.  I just refer the parties to the *Elonis*

15    case, a Supreme Court case at 135 Supreme Court 2001 at page

16    2008, which reviews a number of definitions with respect to what

17    a threat is.  I would note Black's Law Dictionary defines

18    "threat" as a communicated intent to inflict harm or loss on

19    another.

20         And further, the Supreme Court in *Elonis* held that other

21    legal principles require that the government prove in every

22    875(c) case the defendant is conscious of the threatening nature

23    of his communication.  Further, the Fourth Circuit has held that

24    the third element of an 875 charge requires the prosecution to

25    show that, quote, a reasonable recipient who is familiar with

1    the context in which the statement is made would interpret the

2    statement as a serious expression of an intent to do harm.

3         Based on all that, I conclude that a threats charge under

4    875, whether a threat to injure or a threat to kidnap, would

5    qualify as a crime of violence.  It does necessarily, I believe,

6    include threat of a use of force.  Stated another way, I do not

7    see how even a threat to kidnap could be committed without a

8    threat of at least an implied use of physical force against the

9    person or property of another.  And the defendant has not cited

10   any cases that have held otherwise.  Admittedly, there's not a

11   lot of cases out there or any on this issue.

12        But a threat -- in my mind, a threat to trick someone into

13   being kidnapped just makes no sense to me.  *Santoro* held there

14   must be a realistic probability, not a theoretical possibility,

15   that the statute could be applicable without the threatened use

16   of force.  Even if one were to imagine such a hypothetical

17   threatened kidnap by trickery scenario, it's just not something

18   that in my judgment would ever occur in the real world.

19        For that reason, I do not find that there is any realistic

20   probability that 875 criminalizes such conduct.  Rather, it

21   criminalizes the threatened use of force, whether to injure

22   another or to kidnap.  I conclude that the communicated threat

23   made criminal under Section 875 is a crime of violence, making

24   the charge sanction eligible under 3142(f)(1)(A).

25        So that's my ruling on that issue.  Government, I will hear

1    you now on the four factors with respect to this defendant's

2    detention under the Bail Reform Act.

3            MS. AKPAN:  Your Honor, I do apologize.  I think I

4    should have addressed two preliminary matters.

5            THE COURT:  Okay.  Go right ahead.  I know there's one

6    that my clerk told me about.  So yes.

7            MS. AKPAN:  Yes, Your Honor.  On Friday when we had

8    the initial appearance, because of the limited time and the time

9    of day that we had it, I was not able to conclude finishing the

10   financial affidavit form and asked that I be appointed for the

11   initial appearance.  I should have also asked that I be

12   appointed for the detention hearing.  So we are making that

13   request right now.

14           THE COURT:  Okay.  I will permit you to represent him

15   here today.  When can you get me that affidavit, Ms. Akpan?

16           MS. AKPAN:  I will endeavor my best to get it done

17   today, Your Honor.  Communication to the jail has been a

18   challenge this week.

19           THE COURT:  I would like you to submit it by close of

20   business tomorrow.  All right?

21           MS. AKPAN:  Thank you, Your Honor.

22       The second preliminary matter, I do have another hearing at

23   3:45.  I have alerted Judge Bates's courtroom.  I'm happy to

24   start and then come right back in, however Your Honor wants me

25   to proceed.

1          THE COURT:  What do you have with Judge Bates?

2          MS. AKPAN:  It's a status conference before Judge

3    Bates, Your Honor.

4          THE COURT:  Mr. Tran, can you reach out to Judge Bates

5    and say that Ms. Akpan is going to be delayed because she is in

6    the middle of a detention hearing in one of these -- in the

7    case?  All right?  We are still in the middle of this hearing.

8          THE COURTROOM DEPUTY:  Yes, Your Honor.

9          MR. BASET:  Thank you, Your Honor.  If I may inquire

10   initially, there are sensitive aspects about Mr. Meredith's

11   health conditions that I believe should not be made public.  Is

12   there a mechanism by which these matters can be discussed under

13   seal?

14         THE COURT:  Yes.  There is a public line.  Mr. Tran,

15   do we go into a breakout room?  What do we do?  What's the best

16   way for the government to convey its information and Ms. Akpan's

17   response?

18         THE COURTROOM DEPUTY:  I could move the parties

19   accordingly.  I would just need to identify the parties that

20   would need to participate and hear.

21         THE COURT:  It's going to be me, the two government

22   attorneys, Ms. Akpan, the defendant, the court reporter, and

23   yourself so you can see what's going on.

24         THE COURTROOM DEPUTY:  Okay.  I can do that, Judge.  I

25   just need a few moments.

1          THE COURT:  So government, would it assist you to do

2    it right here at the beginning and just get whatever it is you

3    want to say out?

4          MR. BASET:  Yes.

5          THE COURT:  All right.  That's what we will do, then.

6          MR. BASET:  Can we just not mention this part, then,

7    and then we will discuss --

8          THE COURT:  I think it's easier if you make a record

9    now so then you can refer to it.  Give Mr. Tran a moment, and he

10   will move us into the room.

11         MR. BASET:  Thank you.

12      (Beginning of sealed proceedings.)











18          (End of sealed proceedings.)

19          THE COURTROOM DEPUTY:  Okay.  All parties should be

20   back on the line.

21          THE COURT:  Okay.  Government, go right ahead.

22          MR. BASET:  Thank you, Your Honor.  The government is

23   now prepared to address the four factors relating to detention.

24      To begin, there are no conditions or combination of

25   conditions that will ensure the community's safety or his return

1    to the jurisdiction.

2        Specifically put, the defendant drove to D.C. to

3    participate in a violent insurrection on the Capitol on

4    January 6th, and when he missed that opportunity to participate

5    in one of the most hellish days in this city, the nation's

6    history, he remained in the city and continued to communicate

7    multiple threats to multiple people about shooting political

8    leaders in the head, to include Congresswoman Nancy Pelosi and

9    D.C. Mayor Muriel Bowser.

10        And so to that end, in assessing the nature of the offense

11   and whether the offense is actually a crime of violence

12   pertaining to that first factor, the misogynistic and violent

13   rhetoric that are expressed in these texts are horrific and

14   essentially unparalleled.

15        We know, for instance, that, number 1, these texts have

16   become increasingly violent over the last several weeks,

17   culminating in specific threats of violence against specific

18   people, and that includes hostility and violent hostility

19   towards our leaders, as mentioned, Nancy Pelosi and Muriel

20   Bowser, and not only just general threats but specific threats

21   about how he is going to kill them, what type of specific

22   ammunition he is going to use to kill them, including the fact

23   that he wanted to use armor-piercing bullets to accomplish this.

24   And it just so happens to be that armor-piercing bullets are

25   among the types of ammunition that were recovered from his

trailer.

In addition, he expressed extreme animus toward this city of Washington, D.C., and the people that live in it.  As he's on his way, for instance, he sent a text message that he is heading to the city for, quote, target practice.  He indicates his desire to burn the city down.  He even goes so far as to indicate, and these are his own words, that he took affirmative steps in assessing how to accomplish this goal insofar as he strategized the best way to assault the city.  And he is calling for things like war.

And so clearly, this is somebody who relished in the carnage of January 6th as well, reflecting in a text that he thinks that Muriel Bowser was stupid for calling it a domestic act of terrorism.  So he relished even after seeing what had happened.

Moreover, there is a continued indication from him of the potential for future violence.  Specifically, there are texts that indicate that he wanted to stay a day later to, quote, fuck with these commies, in addition a text stating that "I predict that within the next 12 days many in our country will die."  And frankly, that's not a risk that we can take with his release into the community.

Finally, on this first point of the seriousness of this offense, he took substantial steps to see these threats through. He might have indicated that these threats were in jest and that

these are protected First Amendment types of speech, as
Ms. Akpan had argued.  However, he in his own words during the
interview tells officers that he knew that his speech was not
protected and that he knew he had crossed the line.

And moreover, we know that these weren't just idle words
because he actually took steps.  He booked a hotel room.  He
drove from his home to Colorado with a trailer, a cache full of
artillery and ammunition, and then he drove to D.C. with all of
these weapons, to include over 2,500 rounds of ammunition, two
guns, including one AR-style semiautomatic rifle that is used by
the Israeli military.  He also brings with him a scope,
suggesting that he wanted to identify specific targets or at
least hone in on them, and extended clip magazines, at least
three of them, and armor-piercing bullets as mentioned before.
What is especially concerning to see as well is that he even
went so far as to apply duct tape to one of the magazines, the
extended clip magazine, ostensibly so that he can more rapidly
fire the bullets.

And so these are steps that are taken to effectuate the
threats that he's communicated.  And even so, he arrives to the
city a day late, and after missing out, he remains in the city
and continued to --

THE COURT:  Can I ask you, that's the one oddity here.
If he is so intent on coming here and doing these things, why
wasn't he here on the 6th?

1          MR. BASET:  Our investigation at this point has

2     revealed that he was late, his car broke down, and that he was

3     trying to show up but that his car malfunctioned and he arrived

4     late.

5          So even after that, his threats on the 7th are about House

6     Speaker Nancy Pelosi.  And so when that opportunity passes him

7     by on the 6th, he then considers other means of achieving

8     whatever nihilistic, idealogical visions he might have about the

9     government, including assassinating political leaders.

10          And so as to this first condition or factor, the nature of

11     the offense, it's quite clear that this is as violent as

12     possible types of rhetoric and fortunately was something that

13     was discovered and stopped before anything could have gotten

14     worse.

15          As far as the second factor, the weight of the evidence, it

16     is uncontrovertible what has happened here.  The texts speak for

17     themselves.  The defendant in post-custodial interviews admits

18     that the texts were things that he had communicated, and

19     frankly, the evidence that was recovered from his trailer

20     further substantiates his mind-set.

21          The government, we have addressed at some level the history

22     and characteristics of the defendant, but this would also

23     include things such as past conduct.  He acknowledged going to a

24     rally at Governor Kemp's house in Georgia, and he attended that

25     with an AR-style rifle that was in his possession.  Granted, it

is an open carry state, but the nexus between a machine of
violence and his political beliefs and previously discussed
issues is extremely concerning.

Additionally, he has acknowledged drug use, including on
the night of this offense.  And additionally, that day, even
prior to this offense being committed, along the same time that
he is communicating these threats, around 3:00 p.m. that
afternoon, he actually assaults a citizen or resident of the
city who he gets into a road rage issue with because that
individual had double-parked their car, and he head-butts this
person.  An eyewitness who is standing nearby he uses the N-word
against.  So he, over the course of the 24 hours that he was in
the city or less than, committed no less than three offenses,
including gun possession, communicating these threats, and
assaulting people in our city.  So that just goes to show the
mental state that he was in.

And finally, it also dovetails well into the fourth and
final factor I would like to address, which is the dangerousness
to the community.  I think a lot of that has been addressed
above, but one fine point or final point I would make on that is
that this is somebody who we believe is under the spell of the
QAnon extremist ideological conspiracy movement.  And that
especially makes him someone who is volatile and someone who we
cannot necessarily expect to follow any conditions of release
that are issued by this court, an institution of the government

1    that this conspiracy, this ideological conspiracy movement

2    detests.

3         And so for all of the above reasons, there are no

4    conditions or set of conditions that would ensure this

5    community's safety, the nation's safety, and his release -- or

6    his return to this jurisdiction.

7              THE COURT:  Okay.  Thank you.

8         Ms. Akpan?

9              MS. AKPAN:  Thank you, Your Honor.

10        Your Honor, we are requesting that the Court release

11   Mr. Meredith.  He is a 53-year-old father of two children.  He

12   is presumed innocent of the charges.  The Bail Reform Act is

13   written to favor release.  That is what the law says.  It is

14   written to favor release.  And there are conditions, about 14

15   conditions listed in 18 U.S.C. 3142(c).  Several of them could

16   be put in place to ensure the safety of the community and his

17   appearance to court, and Mr. Meredith would comply with any of

18   those conditions.

19        Just listing out at the outset, there's a condition that a

20   person can remain in the custody of a designated person who

21   agrees to assume supervision and report any violations, report

22   to law enforcement regularly, comply with a curfew.  Your Honor

23   can impose a GPS monitor, refrain from using illicit drugs or

24   alcohol, or remove -- and not possess firearms.

25        With all of those conditions that are listed in the Bail

Reform Act, again encouraging courts to release individuals
regardless of the charge, we have to look at that and are
required to look at that closely.

As to the four factors, the nature and circumstances of the
offense, I would note at the outset, Your Honor, that the
government is proceeding by proffer.  However, the agent who
is -- who was involved in investigating the case, I understand,
is present here and has routine information from the government
on some of the text messages.  And I think, Your Honor, the
government's summary, of course, is their summary, but we can
look more closely at the text messages that are clear that
Mr. Meredith has said and explained allegedly that these
statements were made in jest and that he was homeless, namely in
the criminal complaint, for example, Your Honor.  These text
messages were not -- these were text messages with individuals
who were either friends or people that Mr. Meredith knew.  They
were not posted online.  And in these -- and in this
communication, again namely in the criminal complaint, in that
conversation an individual said to Mr. Meredith, "Be careful.
I'm worried about you," to which he replied, "LOL.  I'm just
having fun."  And he explained that he was locked in his hotel
room.

Your Honor, I think that mitigates against this idea that
the government said at the outset that he came to D.C. and drove
to D.C. to participate in a violent insurrection.  The evidence

that the government has provided shows and the government's own evidence has shown that Mr. Meredith had previously come to the Washington, D.C., area in November to participate in a rally at that time.  Again, the government's own evidence shows that at that time, according to what the government is saying his statements were, was that that November rally was a lot of fun, people were really nice and friendly, and so he was coming back to D.C. to participate in that sort of rally that took place in November.

Now, when the authorities arrived at his hotel room, Your Honor, he wasn't found with firearms in his hands.  In fact, he complied with the officers.  He did exactly what they asked.  He even answered questions to them without requesting an attorney be present.

In reference to the text messages, there are statements, again from the government's own evidence, showing that Mr. Meredith intended his comments to be a joke.  Whether they were received that way or not is a separate question, but he intended the information to be a joke.

And I only raise that, Your Honor, because when you look at the threats statute and what is required and what a jury would have to look at, they do have to look at the full context of the text messages, not just the parts that the government pulls out but the entire picture, and that's what the law requires.

So obviously, Your Honor, we would dispute all of these

allegations, but I do want to at least let the Court know that
again without admitting any guilt Mr. Meredith is definitely
remorseful for his conduct in these actions, and not just saying
it -- I'm not just saying that today.  In the evidence that the
government has provided, he stated that he recognizes his
statements were possibly out of line but he intended them as a
joke and possibly wouldn't be received well.

Now, as to the final arm, Your Honor, the government -- I
can't recall which brief it is, but they made this reference to
Mr. Meredith coming from Colorado.  He is actually a resident of
North Carolina.  My understanding is that he is a resident of
North Carolina.  Just looking at the map, Your Honor, if he
intended to come from North Carolina to D.C. for the purpose of
committing any of these acts that the government is claiming, he
could have done so at any other time.  He was coming from
Colorado for a reason.  My understanding is he had been on a
trip there and took a number of firearms heading there.  Again,
the government's own evidence claiming that he was coming from
Colorado and had put a lot of firearms in his trailer heading in
that direction, the government's own evidence says that
according -- that he allegedly explained that when he got close
to D.C. he realized that he probably couldn't have firearms, so
he placed them in his trailer.  And when the officers arrived on
the scene and spoke with him, he didn't have firearms in his
room.  He had them in the trailer and led the officers to the

trailer as to where these firearms were located.

So Your Honor, at least as to the nature and circumstances on the misdemeanor offenses, I can understand the government's concern, but the misdemeanor offenses, again, that's not really the focus here.  It's the threat.  And I as I stated, the full context of those statements have to be put into place.

In reference to the assault, Your Honor, I did ask the government to provide me the information that they cite in their brief.  I have not received that.  So I ask the Court to not put a lot of weight on that, because again we are entitled to see at least some of what they are relying on.  But without much context, we don't know what actually took place.  The government refers to a head-butting.  We don't know if this was in defense of any other action of an individual.  So without that actual evidence, I would submit that the Court has to put at least some of those possible offenses in context in analyzing that.

As to the weight of the evidence, that is the least of the important factors when evaluating whether a person can be released.  Even evidence of guilt doesn't mean that a person can't be released.  That's what the law says.  And there are several cases that say that the weight of the evidence is the least important factor.

Moving on to the third factor, which is the history and characteristics of the defendant, as I stated before, Mr. Meredith is 53 years old, has two sons, had an amicable

divorce from his ex-wife, which also indicates a person who isn't a fighting person.  My understanding from him is that he has participated heavily in his church, even traveled to help build houses in other countries, grew up in a religious home, provides for his ex-wife and his sons and also his roommate.

I will read from a few points that his character reference had stated in a letter that I provided to the government and to the Court in which the character reference states that, "I know him as a staunch and even in-your-face patriotic person but not a troublemaker.  I've never seen him give any indications of being anything other than a genuine and responsible person." And she states that she has no reservations whatsoever about assisting and maintaining a curfew and removing firearms from the home.  We spoke to her, and she would be happy to do whatever the Court requires, including report him if he is in violation of any conditions of release.

Again, I think Your Honor can look to the conduct after. There's no indication he drove to D.C. for the purpose of doing what the government is claiming.  He stated in these text messages, allegedly stated in these text messages that he was in his room there resting, and when the government authorities found him, that's exactly what he was doing.

As to the nature -- the dangerousness to the community, Your Honor, danger to the community is not -- the government relied on two points in their opposition to my motion that

1    Mr. Meredith poses a serious risk of flight because -- I

2    apologize.  I meant to address dangerousness to the community.

3    Again, we look at the community, not just simply where the

4    charge took place but also in the place where the defendant

5    resides and has ties.  My understanding is there's no criminal

6    history here.  He has substantial ties in the North Carolina

7    community.  There is also a third-party custodian ready and

8    available to supervise.  There are a list of conditions that can

9    be put in place to make sure -- I'm sorry.  Can you hear me?

10              THE COURT:  I was on mute.  I'm sorry.  Who are you

11   proposing be the third-party custodian?

12              MS. AKPAN:  Ms. Jeffers, who provided her

13   information --

14              THE COURT:  Oh, okay.  I just wanted to know if it was

15   the same person.

16              MS. AKPAN:  Yes.

17              THE COURT:  All right.  Thank you.

18              MS. AKPAN:  Yes.  A third-party custodian could be in

19   place.  GPS monitoring could be in place as well to make sure if

20   Your Honor orders that Mr. Meredith either stay at his home in

21   North Carolina or any place period, that he be monitored

22   electronically and also supervised by a third-party custodian.

23   That way the Court could not -- the community wouldn't have to

24   be concerned that they didn't know where he was.  He would

25   comply with any curfew requirements on top of that.

 1      The Bail Reform Act, Your Honor, does require the least

 2  restrictive conditions, but Mr. Meredith would comply with even

 3  the most restrictive conditions.  If Your Honor wanted to put in

 4  place all 14 of the conditions, he would comply with that and

 5  with the understanding that if he were to violate any of them he

 6  will be finding himself at the D.C. Jail.  And again, not

 7  possess firearms, report to law enforcement on a regular basis,

 8  refrain from any use of alcohol or anything, and not contact any

 9  of the witnesses, again that exact list in the Bail Reform Act,

10  3142(c).

11      I did want to address the risk of flight now which the

12  government raised in their briefing.  Again, there has to be a

13  serious risk of flight.  That is usually mitigated by an

14  individual turning over their passport and seeing authorities.

15  I would submit that that would be very difficult to do, to flee

16  the country when you're on GPS monitoring.  And in a case like

17  this, Your Honor, I would assume that the authorities would

18  definitely be monitoring Mr. Meredith.

19      And so with that, Your Honor, we believe that there are

20  conditions that can be put in place, even the strictest of the

21  conditions that Mr. Meredith would be more than compliant with

22  in order to show the Court that he is someone who would not

23  violate the conditions and could be released under the strictest

24  of conditions and assure his appearance and the safety to the

25  community.

1              Thank you.

2                   THE COURT:  If I could hear the recommendation from

3       Pretrial, please.

4                   PRETRIAL SERVICES OFFICER:  Good afternoon, Your

5       Honor.  Christine Schuck, Pretrial Services.

6             Pretrial Services's recommendation is there are no

7       combination of conditions that will assure the safety of the

8       community.

9                   THE COURT:  Okay.  Government, any response to

10      anything Ms. Akpan said?

11                  MR. BASET:  Yes, if I may make a few points.

12            The first is that Ms. Akpan's suggestion that the weapons

13      and the ammunition were brought to the District unintentionally

14      or without much thought I think is disavowed by his texts,

15      specifically where he indicates he would like to use the

16      armor-piercing bullets that he is bringing with him to shoot the

17      mayor of D.C., as well as texts that he is sending on the

18      afternoon or evening of the 7th where he is talking about all

19      the weapons that he has in his car, including all the rounds of

20      ammunition.

21            Additionally, the notion that these statements, these

22      things that he said were just in jest is also undercut by the

23      statements that he makes to FBI agents who are interviewing him

24      after his arrest.  He is actually specifically asked if he

25      posted things for -- and this is with respect to social media

posts, but if he posted things for reaction or if he believed

the things that he was saying.  It was a little of both.  And

frankly, we are in no position to take such a risk on someone

who might think it might be a little of both, that it could

actually be serious and it is kind of joking, especially given

his personal characteristics that the government has raised, as

well as sort of the fact that the only way to really sort of

prevent him from necessarily using social media or leaving a

house, he can't be baby-sat 24 hours a day, and the fact that he

has access to things like social media could further make his

ideological bent more serious and more likely to cause the sort

of actions that are going on in his head or about the thoughts

that are going on in his head, and we can't risk him maybe

believing it should happen or maybe not, especially given the

current threat assessments that are hovering over the city over

the next couple of weeks certainly with respect to political

violence that is -- that we're all aware of and concerned about.

THE COURT:  Okay.  Thank you.

Having heard all the arguments and having read through the

briefs submitted by both sides, I am going to grant the

government's request and order Mr. Meredith be detained pending

trial in this case as I believe I cannot fashion a combination

of conditions that would reasonably assure the safety of the

community.

Mr. Meredith, I will be issuing a detention memo shortly

which will outline or detail the basis for my decision, but I
will provide you some of my thinking here today for your benefit
and the benefit of family members who may be on the line
listening today.

Mr. Meredith, you don't have any prior contacts -- or
convictions, I should say, with the criminal justice system.
You have no prior failures to appear or indications that you
would not follow the orders of the Court.  So that part of your
background I think does weight in favor of your release here
today.

I have also considered, though, some of the things that
were discussed during the sealed section, and in addition to
what I am about to say, what we discussed in there certainly
supports my decision and forms part of the basis for it, which I
think would also fall into that category of your history and
characteristics.

But even with somebody who doesn't have any criminal
convictions, in my view sometimes the nature and circumstances
of the offense are so serious and indicative of the danger that
the individual poses to the community were he or she to be
released that detention is justified.  I think this is one of
those cases.

We unfortunately get our fair share of these 875 cases here
in D.C.  Ms. Akpan pointed out and the government concedes,
would agree the government is going to ultimately have to show

that this was a true threat, that this is not a joke.  And I
always look at these cases that come across my desk with an eye
towards that.

I would agree with the government, though.  When I look at
this case, for all the reasons I'm about to say, this would
indicate to me that this was in fact a true threat and that, you
know, a person charged with or what you are charged with doing
would represent a danger to the community.

The government indicated that this -- the allegations in
this case are unparalleled.  If I have had a more concerning
threats case come before me, I don't remember it.  It's
certainly right up there.

Here, I start first with the threats themselves.  They are
numerous.  They are graphic.  They have a level of intensity
that is of concern to the Court.  Just to review a few, there
are threats not only to the Speaker of the House, but Office of
the Mayor, graphically talking about putting bullets or running
them over.  There are also broader threats, I think, to the D.C.
community, indicating that it's wartime, that you're just three
and a half hours outside the city, three and a half hours from
target practice, that D.C. should burn to the ground.  So those
are very concerning threats that I think do appear to have been
serious when made.

There is also a concern to the Court, though, that you
travelled to come here.  Often we have threats made elsewhere,

on the Internet, people sitting in their basement and making

threats to elected officials in D.C.  Here, you took steps to

come here and continued this threatening communication as you

did so and even after you got here.  You drove all the way

across the country, from Colorado, and you brought with you the

means to make good on your threats.

I am very concerned about all the fire power that was found

in the vehicle, a 9-millimeter handgun, a rifle with a

telescopic scope, thousands of rounds of ammunition, including

320 armor-piercing rounds, high-capacity magazines.  I just

don't see any lawful purpose for which you could possibly have

with that sort of fire power in this city.  You are not

authorized to have those firearms in this city.

When I combine it with the texts, the threats, the context

of what was going on last week, I think you represent a certain

danger were you to be released.

I also consider the strength of the government's evidence.

Ms. Akpan is correct that it is the least of the considerations,

but nevertheless, it does appear here the government has a solid

case against you.  The threats were found -- the threatening

messages were found on your cell phone, exchanged with other

individuals who I assume the government could call as witnesses.

You yourself admitted that the texts found on the cell phone

were yours.  The guns were found in your vehicle, in a truck

behind your vehicle, and you admitted that as well.

1    So that's a pretty solid threats and possession of firearms

2    case.  Obviously, I am not making that decision.  That's

3    ultimately a decision for the jury to make if you wish to go to

4    trial.  The Bail Reform Act requires me to consider the strength

5    of the government's evidence, and I do believe it is strong.  So

6    I believe that that factor also weighs in favor of your

7    detention here today.

8         The final factor, what it all comes down to is the

9    seriousness and nature of the danger that your release would

10   pose, and for all the reasons I've said, I do believe you would

11   pose a danger, and I do not believe that I could fashion

12   conditions of release that could reasonably assure the safety of

13   the community, frankly any community at this time.

14        I do not see the point in sending you back to Colorado or

15   North Carolina.  I would not feel like that is sufficient even

16   with GPS monitoring, given what has happened so far in this case

17   that the government alleges that you did in terms of travel to

18   get here.  GPS monitoring is imperfect, and I don't think we

19   have room for error when it comes to you.

20        So for all these reasons, I'm going to order that you be

21   held in this case.

22        Do we have a next date, Mr. Tran?  Have we set a next date,

23   or do we need to do that now?

24             THE COURTROOM DEPUTY:  I'm checking now, Judge.

25             THE COURT:  Maybe the parties remember.  I think we

 1    decided to hold off until I made my decision.

 2              MR. BASET:  Your Honor, if I can interject.

 3              THE COURT:  Sure.

 4              MR. BASET:  I do understand that the defendant is

 5    scheduled to be booked tomorrow on the Superior Court charge of

 6    simple assault for a warrant arising out of that incident.  I

 7    understand that there's a date of January 15th, I believe, that

 8    might have been set.

 9              THE COURT:  In his Superior Court case, you mean?

10              MR. BASET:  Well, he still has to be booked on that

11    case.

12              THE COURT:  I don't have any role in that.  He will

13    have to be taken over there.  I'm just trying to grab the next

14    date in this case.  I don't have it in front of me.  Typically,

15    I don't set the next date until we have had the hearing because

16    that is going to impact whether he is entitled to a preliminary

17    hearing.

18         Two weeks from today would take us out to January the 28th.

19    So that is when I am proposing that we schedule his preliminary

20    hearing.  It's a pretty booked-up day, but I think I could

21    squeeze it in at 3:00 on January the 28th, if that works for the

22    parties.  Government?

23              MR. BASET:  That's a fine date for the government.

24    Thank you.

25              THE COURT:  Okay.  Ms. Akpan?

1          MS. AKPAN:  That's fine for me, Your Honor.  Thank

2   you.

3          THE COURT:  All right.  So that will be January 28th

4   at 3:00.  That will be another virtual hearing, and that will be

5   for a preliminary hearing, assuming Mr. Meredith is not indicted

6   before then.

7       Anything further we need to cover here today?  Government?

8          MR. BASET:  No.  Thank you, Your Honor.

9          THE COURT:  Ms. Akpan?

10          MS. AKPAN:  No.  Thank you, Your Honor.

11          THE COURT:  All right.  The parties are excused.

12       (Proceedings adjourned at 4:23 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1         CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, Sara A. Wick, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7         Please Note:  This hearing occurred during the

8  COVID-19 pandemic and is, therefore, subject to the

9  technological limitations of court reporting remotely.

10

11

12  /s/ Sara A. Wick                January 17, 2021

13  SIGNATURE OF COURT REPORTER     DATE

14

15

16

17

18

19

20

21

22

23

24

25