## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| v. | ) | |
|  | ) | Crim. Action No. 21-0159 (ABJ) |
| CLEVELAND | ) | |
| GROVER MEREDITH, JR., | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

The Supreme Court has stated:

> When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community . . . a court may disable the arrestee from executing that threat.

*United States v. Salerno*, 481 U.S. 739, 751 (1987).  Here the Court is presented with precisely that situation, and defendant's motion for release will be denied.

Defendant Cleveland Grover Meredith, Jr. has been indicted on four counts:  (1) Interstate Communication of Threats, in violation of 18 U.S.C. § 875(c); (2) Possession of Unregistered Firearms, in violation of 7 D.C. Code § 2502.01(a); (3) Possession of Unregistered Ammunition, in violation of 7 D.C. Code § 2506.01(a)(3); and (4) Possession of Large Capacity Ammunition Feeding Devices, in violation of 7 D.C. Code § 2506.01(b).  Indictment [Dkt. # 28] at 1–2.  He has been detained since his arrest on January 8, 2021, and a Magistrate Judge granted the government's motion for pretrial detention on January 14, 2021.  Min. Entry (Jan. 14, 2021); *see also* Order of Detention Pending Trial [Dkt. # 10].

1

Pending before the Court is Defendant's Motion to Revoke Magistrate Judge's Order of Detention Pending Trial and to Set New Conditions of Release [Dkt. # 19] ("Def.'s Mot."). The government opposes the motion, *see* Gov't's Opp. to Mot. [Dkt. # 23] (SEALED) ("Gov't Opp."), and the Court held a hearing on the motion at which it heard from counsel as well as defendant's parents. *See* March 26, 2021 Tr. ("Mar. 26 Tr.").[1] The Court gave the parties an opportunity to elaborate on their positions after the hearing; the government has supported its opposition with the additional documents requested by the Court—an FBI Form 302 report of two interviews dated January 7, 2021 [Dkt. # 26] (SEALED) ("1/7/21 FBI 302") and another dated January 15, 2021 [Dkt. # 26-1] (SEALED) ("1/15/21 FBI 302")—and the parties have both filed supplemental briefs. *See* Defendant's Suppl. to Mot. [Dkt. # 35] (SEALED) ("Def.'s Suppl. Br."); Gov't's Suppl. in Opp. [Dkt. # 32] (SEALED) ("Gov't Suppl. Br.").

Because the Court finds that no condition or combination of conditions will ensure the safety of the community, the motion will be denied.

## BACKGROUND

On January 7, 2021, the FBI received a tip that defendant had made a threat directed towards the Speaker of the House, Nancy Pelosi; he sent a text which said, "Thinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV [purple devil emoji]." Compl. [Dkt. # 1] at 2.

The caller ███████████████. According to the FBI's report of the conversation, she informed the agents that defendant had "traveled to D.C. to participate in the pro-Trump rally" on January 6, and that he "has guns and ammunition in his trailer." 1/7/21 FBI 302 at 1–2. His

---

1       As noted in a minute order dated April 20, 2021, portions of this transcript are sealed and the transcript is not on the docket.

truck broke down on the way to Washington, and he did not arrive until the evening of the January

6. *Id.* at 2.



That evening, FBI agents determined that defendant was staying at the Holiday Inn located

at 550 C Street SW, Washington, D.C.  Compl. at 2.  Agents made contact with defendant, and he

consented to a search of his hotel room, as well as his Ford truck, Spartan trailer, and cell phone.

*Id.*

Defendant told the agents that although he intended to arrive in Washington on January 5, 2021, he did not complete the trip from Colorado until January 6, and he was too late to attend the rally held on that date.  Compl. at 2.  He stated that he had come to the District for a previous rally in November and that he had also attended a protest outside of Governor Brian Kemp's residence in Georgia.  *Id.*

Defendant admitted that he drove to Washington with two firearms in his truck, but since he knew that he was not supposed to carry firearms in the District, he moved them to his trailer. Compl. at 2.  When agents searched the trailer, they recovered "a Glock 19, nine millimeter pistol [and] a Tavor X95 assault rifle" with a telescopic sight, Compl. at 3; more than 2,500 rounds of ammunition, including 320 armor-piercing rounds; and multiple high capacity magazines.  Jan. 14, 2021 Tr., Ex. 4 to Gov't Opp. [Dkt. # 23-4] ("Jan. 14 Tr.") at 21, 36; *see also* Gov't Opp. at 3–4.  A January 8, 2021 check of the records maintained by the Metropolitan Police Department revealed that defendant does not possess a valid registration for any firearm in the District.  Compl. at 3.  While searching the hotel room, the agents noted vials of the prescription medications Adderall and Escitalopram, Def.'s Suppl. Br. at 2, and they found and seized a box of suspected THC edibles and a vial of Testosterone Cypionate/Propionate.  Compl. at 3.

Defendant admitted sending the text messages on his cell phone to his friends.  Compl. at 2. In one message from January 6, defendant reported on his status:  "I'm trying but currently stuck in Cambridge, OH with trailer lights being fixed, crappers."  *Id.*  Later, he sent a photo of his truck and trailer accompanied by this message:

> Just fixed…headed to DC with a shit ton of 5.56 armor piercing ammo [purple devil emoji].

*Id.*  The search of the phone also produced additional text messages transmitted by defendant.

**January 4, 2021:**

- "We're gonna surround DC and slowly constrict."

- "I'm harmless . . . I won't fire until ordered SIR!"

**January 6, 2021:**

- "Burn DC to the FKG ground."

- "Ready to remove several craniums from shoulders."

- "I'm so ready to FK SOME TRAITORS UP."

- "I'm gonna collect a shit ton of Traitors heads."

- "Hauling ass, 3.5 hours from target practice."

- "It ain't just me, someone has to take the TRASH out, FK THESE MTHRFKRS."

**January 7, 2021:**

- "Psychological warfare.  I've been on the radar for a while now, they now [*sic*] I'm harmless."

- "I'm gonna run that CUNT Pelosi over while she chews on her gums."

- "Dead Bitch Walking.  I predict that within 12 days, many in our country will die."

- "I may wander over to the Mayor's office and put a 5.56 in her skull, FKG cunt."

- "You get that one Mr. Marxist FBI Agent?  Go FK yourself."

- "Thinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV."

- "Staying one more day since I got here late, need to FK with these commies."

- "How much u give me to go trench the Capital lawn with ma big truk?"

- "I'm gonna walk around DC FKG with people yelling 'Allahu ak Bar' randomly."

- "I ain't goin to jail, the morgue maybe, not jail."

- "Locked in my hotel room…high [smiley face with hearts emoji]."

Compl. at 2; Gov't Opp. at 2–3.

Defendant was arrested.  At a pretrial detention hearing on January 14, 2021, the Magistrate Judge found that a threat to injure another in violation of 18 U.S.C. § 875(c) satisfied the legal definition of a crime of violence, and that defendant was therefore eligible for pretrial detention under section 3142(f)(1)(A) of the Bail Reform Act.  Jan. 14 Tr. at 4–11.  He then noted that the threats were numerous, violent, and graphic; that defendant did not merely disseminate threatening communications, but he drove across the country to the District of Columbia where his targets were located; and that he arrived here with a substantial and concerning amount of "fire power," including the armor piercing bullets he had announced he would utilize.  Jan. 14 Tr. at 35–36.  As a result, the Magistrate Judge ordered defendant detained, as no set of conditions of defendant's release could reasonably assure the safety of the community.  Jan. 14 Tr. at 33, 37.

## STANDARD OF REVIEW

The Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq.*, starts with the proposition that the judicial officer shall order pretrial release on personal recognizance or an unsecured appearance bond unless he or she determines that release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.  *See id.* § 3142(b).  If conditions are required, the law provides that the defendant shall be released subject to the condition that he not commit a federal, state, or local crime, and subject to the least restrictive further condition, or combination of conditions, that the judicial officer determines will reasonably assure the appearance of the person and the safety of any other person and the community.  *See id.* § 3142(c)(1).

The government may move for pretrial detention in limited circumstances that are enumerated in the Act.   Here the government has moved for detention on the grounds that defendant is charged with "a crime of violence."  18 U.S.C. § 3142(f)(1)(A).

If the judicial officer finds after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, the judicial officer 'shall' order the detention of the person before trial."  18 U.S.C. § 3142(e)(1).  Under the terms of the statute, the facts the judicial officer relies upon to support a finding that no conditions will assure the safety of the community must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f).  Even if the defendant does not pose a flight risk, danger to the community alone can be a sufficient reason to order pretrial detention.  *United States v. Salerno*, 481 U.S. 739, 751 (1987) ("When the government proves by clear and convincing evidence that an arrestee presents and identified an articulable threat to an individual or the community, . . . a court may disable the arrestee from executing that threat."); *United States v. Simpkins*, 826 F.2d 94, 98 (D.C. Cir. 1987).

When community safety is the basis for detention, the government must prove the need for detention by clear and convincing evidence.  *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996).  To determine whether the government has carried its burden by clear and convincing evidence, the Court must consider:  (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence," (2) "the weight of the evidence against the [defendant]," (3) "the history and characteristics of the [defendant]," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).   This is a forward-looking inquiry; "a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the

defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *United States v. Munchel,* 991 F.3d 1273, 1280 (D.C. Cir. 2021); *see Salerno,* 481 U.S. at 752.

Finally, although the D.C. Circuit has not yet addressed the issue, courts in this district and many other circuits agree that the district judge should review *de novo* a detention decision rendered by a Magistrate Judge. *See, e.g.*, *United States v. Hassanshahi*, 989 F. Supp. 2d 110, 113 (D.D.C. 2013); *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990) (collecting cases); *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001); *United States v. Gonzales*, 149 F.3d 1192 at *1 (10th Cir. 1998); *United States v. Hazime*, 762 F.2d 34, 36 (6th Cir. 1985); *United States v. Portes*, 786 F.2d 758, 761 (7th Cir. 1985).  The Court will follow that procedure in this case.

## ANALYSIS

I.      **There is a legal basis for the government to seek detention under the Bail Reform Act.**

### A.  The Categorical Approach

The Bail Reform Act defines a crime of violence as:

> (A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another;

> (B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense; or

> (C) any felony under chapter 77, 109A, 110, or 117.

18 U.S.C. § 3156(a)(4).   The government relies on subpart A of the statute, known as the "elements" or "force" clause, to argue that the indictment has charged defendant with crimes of violence.  *See* Gov't Opp. at 7–9.  Therefore, the Court must determine whether 18 U.S.C. § 875(c)

has "as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 3156(a)(4)(A).

In order to make this determination, the Court must apply the "categorical approach." *United States v. Singleton*, 182 F.3d 7, 11 (D.C. Cir. 1999) (holding that the Bail Reform Act requires courts to identify crimes of violence on a categorical basis based upon the "plain meaning of § 3156").  Under this approach, the Court must examine the elements of the crime charged, not the "factual peculiarities of a particular case."  *Id.*  "In other words, [courts] assess the crime categorically, 'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.'"  *United States v. Haight*, 892 F.3d 1271, 1279 (D.C. Cir. 2018), quoting *Begay v. United States,* 553 U.S. 137, 141 (2008).  Accordingly, if the law defines the crime in such a way that it can be committed either with or without the "use, attempted use, or threatened use of physical force," then it is not a crime of violence under 18 U.S.C. § 3156(a)(4)(A).

**B.  18 U.S.C § 875(c) is a crime of violence.**

In Count One, defendant is charged with the interstate communication of a threat to injure the Speaker of the House in violation of 18 U.S.C. § 875(c).  Indictment at 1.  Section 875(c) prohibits any interstate "communication containing any threat to kidnap any person or any threat to injure the person of another."  18 U.S.C. § 875(c).  Defendant argues that Section 875(c) is not a crime of violence because kidnapping can be accomplished in the absence of physical restraint, and therefore it lacks the requisite element of physical force.  *See* Mem. in Supp. of Release [Dkt. # 5] at 5.[2]  The government points to the fact that the superseding indictment alleges a threat

---

2       The motion before this Court incorporates the arguments made previously in the initial motion before the Magistrate Judge.  Def.'s Mot. at 5–6.

to injure only, that it does not track the statute to include the reference to a threat to kidnap, and that the specific threat quoted in the indictment includes a threat of physical harm. *See* Gov't Suppl. Br. at 5. It contends that the Court only needs to analyze whether a "threat to injure" qualifies as a crime of violence, because section 875(c) is a divisible statute, and therefore a "modified categorical approach" can be utilized in this instance. *Id.* at 2.

According to the Supreme Court, the modified categorical approach is simply "a tool for implementing the categorical approach." *Descamps v. United States*, 570 U.S. 254, 262 (2013). It applies in a

> narrow range of cases in which a divisible statute, listing potential offense elements in the alternative, renders opaque which element played a part in the defendant's conviction. Because a sentencing court cannot tell, simply by looking at a divisible statute, which version of the offense a defendant was convicted of, the court is permitted to consult extra-statutory documents – but only to assess whether the defendant was convicted of the particular statutory definition.

*Id.* at 254–55 (internal quotation marks omitted); *see also United States v. Redrick*, 841 F.3d 478, 482 (D.C. Cir. 2016), quoting *Mathis v. United States*, 136 S.Ct. 2243, 2249 (2016) ("When we are dealing with a so-called 'divisible' statute, we are to employ the 'modified categorical approach' to determine which alternative crime the defendant committed. To do so, we look beyond the statute 'to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, [the] defendant was convicted of.'").

The Court finds that the modified categorical approach is applicable here because section 875(c) is divisible: it lists potential offense elements in the alternative. *Descamps*, 570 U.S. at 257. The language in the statute is disjunctive; a section 875(c) crime can be accomplished

by threatening to kidnap, "*or*" by threatening to injure a person.  18 U.S.C. § 875(c) (emphasis added).

Defendant resists this conclusion and points out that the Supreme Court has been careful to differentiate between language that delineates different *elements* of a crime and language that lists different *means* of carrying out the same element.  As an example, in *Mathis,* the Court identified a statute that "requires use of a 'deadly weapon' as an element of a crime and further provides that the use of a 'knife, gun, bat, or similar weapon' would all qualify."  *Mathis*, 136 S.Ct. at 2249.  In such a case, the element is use of a deadly weapon, and the "knife, gun, bat, or similar weapon" are means by which the element may be proven.  Defendant argues that § 875(c) is also a "means" statute, and that threats to kidnap and threats to injure are different "means" of threatening.  Mem. in Supp. of Release at 7.

But this statute is unlike the *Mathis* example as it does not "enumerate[] various factual means of committing a single element," 136 S.Ct. at 2249; threats to injure and threats to kidnap are distinct offenses as opposed to mere examples of ways in which a single offense could be carried out.  In other words, by including both threats to kidnap and threats to injure, the statute is not identifying alternative means of committing the offense—it is specifying the two different types of threats that are punishable under the statute.  Because the statute "lists multiple elements disjunctively," it is divisible.  *Id.*

Here, the superseding indictment specifically alleges a threat to injure, and the text message that is quoted in the indictment unambiguously conveys a threat to cause physical harm.

Although the D.C. Circuit has not analyzed whether a "threat to injure" categorically involves a threat of physical force, the Court finds it persuasive that every circuit court to analyze

11

the parallel statute, 18 U.S.C. § 876, has found that it to be a crime of violence.[3] *United States v. Stoker*, 706 F.3d 643, 648 (5th Cir. 2013) (noting that "[e]very other court has agreed" that "any threat to injure the person" categorically involves a threat of physical force), citing *United States v. Archer*, 93 Fed. Appx. 767, 768 (6th Cir. 2004); *see also United States v. Chapman*, 866 F.3d 129, 134–35 (3rd Cir. 2017); *United States v. De La Fuente*, 353 F.3d 766, 770–71 (9th Cir. 2003); *id.* at n.3 (collecting cases); *United States v. Littlejohn*, No. 97-4092, 1998 WL 13526, at *3 (4th Cir. Jan. 15, 1998) (unpublished).  Defendant has not pointed to any contrary authority. Accordingly, the Court finds that 18 U.S.C § 875(c) is a divisible statute, and that a threat to injure is a crime of violence for purposes of the Bail Reform Act that can support a motion for pretrial detention.[4]

## II.   The Section 3142(g) factors support a finding by clear and convincing evidence that there are no conditions of release that would adequately protect the community.

In the pending motion to revoke the Magistrate Judge's order of detention, the defense laid out a number of conditions defendant would be willing to accept:

(1) defendant's parents would serve as third-party custodians;

(2) defendant would abide by home detention, GPS monitoring, or a curfew;

(3) defendant would undertake medical, psychological, or psychiatric treatment, and remain in a specified institution if required for that purpose and directed by his health care provider;

(4) defendant would not knowingly make contact with any person or group associated with the conspiracy theory known as "QAnon";

---

3    These cases involve 18 U.S.C. § 876(c), which prohibits the mailing—as opposed to the interstate transmission—of "any threat to kidnap any person or any threat to injure the person of the addressee or of another."

4    *See also United States v. Spann*, No. 19-252 (D.D.C. Sept. 9, 2019) [Dkt. # 16] (order finding defendant eligible for pretrial detention as 18 U.S.C § 875(c) is a crime of violence).

(5) defendant would relinquish all firearms and dangerous weapons to law enforcement officials;

(6) defendant would refrain from the use of alcohol or controlled substances without a prescription;

(7) defendant would report to a designated law enforcement agency on a regular basis;

(8) defendant would relinquish his passport and not commit any federal, state, or local crimes while on release;

(9) defendant would agree to execute a bail bond.

Def.'s Mot. at 10–13.

Defendant's proposal was refined somewhat at the hearing and in the post-hearing submissions, *see* Def.'s Suppl. Br. at 1–2, and it falls to the Court to determine, based upon consideration of all of the section 3142(g) factors, whether there are conditions that could mitigate the risks that concerned the Magistrate Judge.

### A.  The Nature and Circumstances of the Offense

In determining whether there are conditions of release that will assure the defendant's appearance and the safety of the community, the Court must first consider "the nature and circumstances of the offense charged."  18 U.S.C. § 3142(g)(1).  Section 3142(g)(1) specifically directs the Court to consider "whether the offense is a crime of violence" in making that assessment, and here the Court has found that a "threat to injure" under 18 U.S.C § 875(c) is a crime of violence.

Furthermore, the particular circumstances of the charged offense strongly support detention.  Not only did defendant threaten to wreak mayhem in general in the nation's Capital, he used graphic and misogynistic language to threaten to kill particular public figures in the District in specific and violent ways.

What's worse, defendant did not simply spew ugly language into cyberspace from afar.  He drove from Colorado to the District of Columbia with an arsenal in his possession:  a Glock 19, nine millimeter pistol, a Tavor X95 assault rifle with a telescopic sight, high capacity magazines, and more than 2,500 rounds of ammunition.  Compl. at 3; Jan. 14 Tr. at 36.  In other words, defendant had the tools at hand to do exactly what he was threatening to do.  He boasted about the contents of his truck when he knew full well that he was not permitted to possess firearms in the District.  And the chronology reveals that his violent plans were not only in reaction to missing the events of January 6; he stewed for several days on the way here, starting with his suggestion on January 4 that "[w]e're gonna surround DC and slowly constrict," Gov't Opp. at 2, and his announcement when he got back on the road that he was "headed to DC with a shit ton of 5.56 armor piercing ammo."  Compl. at 2.  This was followed by, "Burn DC to the FKG ground," "Hauling ass, 3.5 hours from target practice," "Ready to remove several craniums from shoulders," and "I'm gonna collect a shit ton of Traitors heads."  Compl. at 2; Gov't Opp. at 2–3.

These messages are chilling.  But defendant's rumblings did not end once he'd missed the attack on the Capitol.  On January 7, he did not go home, and he was still spoiling for a fight: "Staying one more day since I got here late, need to FK with these commies," Gov't Opp. at 3; "I predict that within 12 days, many in our country will die."  Compl. at 2.  As defendant remained in the city, he focused more directly on the Speaker of the House, calling her a "Dead Bitch Walking."  *Id.*  But he also got more specific, starting with "I'm gonna run that CUNT Pelosi over," and later announcing, "Thinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV."  *Id.*  His contempt expanded to include the Mayor of the District of Columbia, and he threatened to "wander over to the Mayor's office and put a 5.56 in her skull,

FKG cunt." Gov't Opp. at 3.  Again, the risk he posed cannot be minimized.  At that very moment, he was located in the District, and his trailer was filled with that exact kind of ammunition.

The defense does not deny that defendant issued these statements, but it asserts that "the allegedly threatening communications were not meant to be taken seriously."  Def.'s Mot. at 7, quoting Jan. 14 Tr. at 25 ("LOL. I'm just having fun.").

The problem with this argument, of course, is that defendant's statements were not the least bit funny.  No one was laughing out loud then or now.  The texts were sufficiently frightening to the friends and family members who received them that several begged him to desist, *see, e.g.*, Gov't Opp. at 8 ("Ok, but please stop talking like that. Pretty please…" and "Don't do it!!"); *see also* Compl. at 2 ("That comment you made about Pelosi, what the fuck are you thinking. Get real ▮▮▮▮▮ and ▮▮▮▮▮▮▮ was so deeply concerned that ▮▮ reported him to the FBI.

### B.  The Weight of the Evidence Against the Defendant

The Court acknowledges that there is no evidence that the communications made their way to the particular individuals involved, but the undisputed evidence supporting the charges is quite strong given the communications found in the consensual search of the phone and the ominous contents of defendant's truck.

Courts in other circuits have cautioned, though, that a district court assessing the weight of the evidence may not consider the evidence of a defendant's guilt, but must only consider the weight of the evidence of defendant's dangerousness.  *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010); *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (holding that section 3142(g) "neither requires nor permits a pretrial determination of guilt").  Here, the same evidence serves that purpose as well; the violent nature of the threats and defendant's trip to the District of Columbia armed with the means to carry them out tips the scale firmly in the direction

of detention.  In addition, other evidence that also bears on defendant's dangerousness is detailed in connection with the third factor:  the history and characteristics of the defendant.

### C. The History and Characteristics of the Defendant







In response, the government summarized the information ████████████████

████████ and also presented evidence that defendant had been involved in a "road rage" incident

while in the District of Columbia. *See* Ex. 1 to Gov't Opp. [Dkt. # 23-1] at 2–3 (police report

indicating that, when the complainant was getting out of his car, the man driving the car behind

him—later identified as Meredith—began honking at him and then got out of the car to confront

him; "complainant reports being head butted by the suspect.   The suspect then assaulted the

complainant while he was on the ground.   The suspect fled in his vehicle."). Moreover, in 2018,

defendant was involved in a similar incident in Georgia in which he pointed a firearm at the other

driver. *See* Ex. 2 to Gov't Opp. [Dkt. # 23-2]; *see also* Mar. 26 Tr. at 54.

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████   In sum, the history and characteristics weigh heavily in favor of detention.

**C. The Nature and Seriousness of the Danger to any Person or the Community that would be Posed by the Defendant's Release**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████   The steady

drumbeat that inspired defendant to take up arms has not faded away; six months later, the canard

that the election was stolen is being repeated daily on major news outlets and from the corridors

of power in state and federal government, not to mention in the near-daily fulminations of the

former President. ██████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████The issues facing the Court today

are the same as those that were quite apparent at the hearing, and the supplemental information

that has been submitted does not resolve any of them.█

████████████████████████████

█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████████████████

█████████████████████████████████████████████████████████

For all of these reasons, the Court finds that defendant poses an articulable threat of physical harm to public officials and ordinary citizens who may represent opposing viewpoints,



and to family members and other members of the community who may attempt to stand in his way

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████     This is a substantial risk the Court is not prepared to take,

and the government has proved by clear and convincing evidence that it cannot be ameliorated by

███████████████████████████████████████████████     conditions of

release.

The motion to revoke the order of detention will be denied; a separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  May 26, 2021