**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE NO. 1:21-cr-00159-ABJ** |
| | : | |
| **CLEVELAND GROVER** | : | |
| **MEREDITH, JR.** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Sentencing Memorandum.

## I.    Introduction

The Defendant, Cleveland Grover Meredith, Jr., (hereinafter "Defendant") drove from Colorado to Washington, D.C., and while in route, and after arriving there on January 6, 2021, sent several text messages threatening to engage in violence in D.C.  *See* ECF, 47 (agreed "Statement of Offense"), ¶¶ 1,2, 5.   Defendant remained in D.C. on January 7, 2021, and sent a text message threatening to shoot Speaker of the House Nancy Pelosi.  *See* ECF, 47, ¶ 2. Defendant's mother contacted the FBI to warn of Defendant's threats and to prevent her son from harming himself and others. *See* ECF, 47, ¶ 3.  Defendant was arrested in a hotel in D.C. before he could carry out his threats. *See* ECF, 3. He had in his possession an assault-style rifle with a telescopic sight, a 9 mm semi-automatic firearm, over 2,500 rounds of ammunition, and multiple high-capacity magazines. *See* ECF, 47, ¶ 6.

Defendant has been charged in this case with violations of 18 U.S.C. § 875(c) (Interstate Communication of Threats); D.C. Code § 7-2502.01(a) (Possession of Unregistered Firearm);

1

D.C. Code § 7-2506.01(a)(3) (Possession of Unregistered Ammunition); and D.C. Code § 7-2506.01(b) (Possession of Large Capacity Ammunition Feeding Devices). *See* ECF, 28 (Superseding Indictment).  On September 10, 2021, Defendant pled guilty to one count of making felony threats in violation of Title 18 U.S.C. § 875(c). *See* ECF, 46.

Probation has determined that Defendant's base offense level is 12, and that 6 levels should be added pursuant to U.S.S.G. § 2A6.1(b)(1) because his offense involved conduct evidencing an intent to carry out his threat. Presentence Investigation Report (PSR), ¶¶ 25, 26. Probation also calculated a 6-level increase in the offense level pursuant to U.S.S.G.  § 3A1.2(b) because the victim was a government officer (United States Speaker of the House Nancy Pelosi) and Defendant's threats were motivated by her status.  PSR, ¶ 27.  This latter enhancement is one the parties did not anticipate. *See* ECF 46 (Plea Letter), at 3.  After accounting for Defendant's acceptance of responsibility and his criminal history, Probation has determined that Defendant's total offense level is 21, PSR ¶¶ 32-34, his criminal history category is I, PSR ¶ 37, and his guideline range of imprisonment is 37 to 46 months.   PSR, ¶ 100.

In their plea agreement, the parties anticipated a guideline range of either 6 to 12 months imprisonment or 18 to 24 months imprisonment, based upon the Defendant's criminal history, the offense level that the parties estimated, and the Court's determination of whether U.S.S.G. § 2A6.1(b)(1) applied.  *See* ECF 46, Plea Letter, at 4. The parties nevertheless reserved the right to allocute for a sentence within the guideline range ultimately determined by the Court if that range was different from the estimated guideline range the parties had initially anticipated. *See*

ECF 46, at 5.[1]

The Government acknowledges that based on applicable case law relevant to this analysis, the plea agreement should have accounted for the official victim enhancement pursuant to U.S.S.G. 3A1.2(b). To be clear, consistent with the plea agreement, the government is not advocating for imposition of that enhancement. *See* ECF No. 46, at 4 ("Except as provided for in the "Reservation of Allocution" section below, the parties also agree that neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above in subsection A".) However, the parties have "reserve[d] the right to answer any related inquiries from the Court or the presentence report writer, and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein." *Id*. at 5.  As authorized by that provision, if the Court determines that the official victim enhancement in U.S.S.G. 3A1.2(b) applies and the applicable Guidelines range is 37 to 46 months, the Government will allocute for an appropriate sentence within that range. We believe that a mid-guideline range custodial sentence, followed by 3 years' supervised release would be

---

[1]  The Plea Letter state as follows:

In the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein. *See* ECF, 46 at 5.

"sufficient but not greater than necessary" here. *See* 18 U.S.C. § 3553(a). That sentence would reasonably take into account the danger of threatening a public official – even privately to family and friends – particularly when such threats are coupled with dangerous behavior, such as traveling thousands of miles with firearms and ammunition that one threatens to use.  Since the purpose of the Federal Sentencing Guidelines is to make sentencing more structured and certain, *see* "An Overview of the United States Sentencing Commission – January 5, 2011" (available at https://www.ussc.gov/sites/default/files/pdf/about/overview/USSC_Overview.pdf), and the guidelines, although advisory in nature, are presumptively reasonable, *Rita v. United States*, 551 U.S. 338 (2007), the Government submits that imposition of the correct guidelines helps ensure consistency across the United States, and does not permit certain defendants to seek windfalls as a result of enhancements that the government overlooked in a plea agreement.[2]

Similarly, if this Court finds that the official victim enhancement does *not* apply, we would also request a custodial sentence at the mid-range of the Court-decided guidelines, followed by 3 years of supervised release.

## II.     Factual and Procedural Background

Defendant drove from Colorado to Washington D.C. and arrived in the evening of January 6, 2021 after the riots at the U.S. Capitol had ended. Defendant planned to participate in rallies supporting President Trump but arrived too late to attend. *See* ECF 47, ¶ 1. On January 1, 2021, before he began his drive to D.C., Defendant posted the following message on Facebook

---

[2] On November 17, 2021, the Government informed defense counsel of its intention to allocate within the guideline ultimately determined by the Court, but that it would not oppose Defendant's withdrawal from the validly-entered September 10, 2021 plea agreement should Defendant choose to do so.

forecasting his actions for the days to come:

**Posted** 2021-01-01 20:19:35 UTC
**Status** Allow your enemy to be boastful, to think he has won.  Present yourself as weak, disorganized.   Then eradicate

Defendant began his trip to D.C. on January 4, 2021.  While in route, he sent several menacing and threatening text messages. *See* ECF 47, at 5; *See* Exhibit 1 (Defendant's text messages, with redacted third-party identities.).

On January 4, 2021, Defendant sent text messages that stated as follows:

- 5000rds of armor piercing green tip 5.56[3] in ma truk

- We're gonna surround DC and slowly constrict

*See* Exhibit 1.

On January 6, 2021, Defendant was still driving to D.C. and had vehicle problems. Early in the afternoon, Defendant texted a picture of his truck and trailer and stated, "Just fixed…head to DC with a shit ton of 5.56 armor piercing ammo." *See* Exhibit 1.

Later on January 6th, one of Defendant's friends told him about the riot at the Capitol and Defendant responded, "Burn DC to the FKG ground".  To another friend he proclaimed, "War time".  About two hours later. Defendant sent texts stating:

- Ready to remove several craniums from shoulders

- I'm so ready to FK SOME TRAITORS UP

- I''m gonna collect a shit ton of Traitors heads

---

[3] Referring to 5.56 x 45 millimeter rifle cartridges.

*See* Exhibit 1.  Another friend texted Defendant stating, "I think Trump wants you to go home peacefully!!" Defendant responded, "Bullshit, he wants HEADS and I'm gonna deliver".  As Defendant continued driving to D.C., he texted, "Hauling ass, 3.5 hours from target practice" … "It ain't just me, someone has to take the TRASH out, FK THESE MTHRFKRS" *See* Exhibit 1.

On January 7th, Defendant remained in D.C. and sent the following text messages:

- I wonder if trump still has something. Lord I hope so

- I may wander over to the Mayor's office and put a 5.56 in her skull, FKG cunt

- I hope you're reading this Mr. FBI agent, FK U

*See* Exhibit 1.  A friend asked Defendant, "You back tonight?" and Defendant, stated, "Strategizing on best way to assault this city...do I go in fast on Sportbike or do I go in the back door on dirt bike  Staying one more day since I got here late, need to FK with these commies." Defendant later referred to the Mayor of D.C. as a "C U N T", and then threatened, "Thinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV." *See* Exhibit 1. He then sent the following texts:

- You get that one Mr. Marxist FBI Agent? Go FK yourself

- Thinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV. You get that one Mr. Marxist FBI Agent? Go FK yourself.

- I ain't goin to jail, the morgue maybe, not jail

- How much u give me to go trench the Capital lawn with ma big truk?

- I'm gonna run that CUNT Pelosi over while she chews on her gums

- Dead Bitch Walking

- I predict that within the next 12 days, many in our country will die

*See* Exhibit 1. One of Defendant's friends then texted Defendant, "Cleve, I know you're kidding, really, but for your own good, please do [sic] text direct threats like that. It's actually illegal, isn't it, to say "I'm going to _____"  If u believe in deep state, then u surely believe the left will protect itself by prosecuting it's enemies that happen to slip up and break a law, right?" Defendant responded by texting a picture of himself wearing a black balaclava and warned that, "I'm gonna walk around DC FKG with people by yelling "Allahu ak Bar" randomly". *See* Exhibit 1.

Defendant's relative, who interpreted Defendant's statement that he was threatening to shoot Speaker of the House Pelosi, contacted Defendant's mother, who then contacted the FBI as she was concerned for the safety of Defendant and others. *See* ECF 47, at 3; PSR, ¶ 12. The FBI located Defendant in a Holiday Inn Hotel on C Street in Southwest Washington D.C. on the night of January 7, 2021; the hotel is approximately one mile from the U.S. Capitol as shown in the image below.



After waiving his *Miranda* rights, Defendant agreed to be interviewed by FBI agents. He also gave the agents consent to search his telephone, his truck, and his trailer. *See* ECF 47, at 4.

The agents examined the contents of Defendant's telephone, in which they found the text messages set forth above.  Defendant admitted that he sent those messages from January 4 to 7, 2021 while in Colorado and Washington D.C. and in route to Washington, D.C. *See* ECF 25, at 5.

In Defendant's trailer, which he drove to Washington D.C. and parked at the hotel, the FBI agents found a Glock 19, nine-millimeter handgun, and a model IWI Tavor X95 rifle, approximately 2,500 rounds of ammunition, and 10 large capacity ammunition feeding devices. *See* ECF 47, at 5, 6.  Those rounds included:

* Approximately 856 loose and boxed 9 mm cartridges;

* Approximately 320 loose, green tipped, LC17 rifle cartridges;

* Approximately 1001 loose, copper-color tipped, 5.56 mm rifle cartridges;

* Approximately 94 loose 30-30 rifle cartridges;

* Two 15-capacity 9 mm magazines containing approximately 29 total cartridges;

* Two 31-capacity 9 mm magazines containing approximately 62 total cartridges;

* One 50-capacity 9 mm drum magazine containing approximately 53 total cartridges;

* Five 5.56 mm rifle magazines containing a total of 118 cartridges (110 copper-color tipped cartridges and 8 green tipped cartridges); and

* One 9 mm expended cartridge case.

The firearms and ammunition are shown in the photographs below:





Defendant also had an all-terrain vehicle (ATV) and motorcycles in his trailer as shown in the photographs below:



Defendant admitted to investigators that the firearms and ammunition belonged to him and that he knew that possession of firearms in D.C. was a violation of the law.

## III.     The Charges and Plea Agreement

On January 8, 2021, Defendant was charged by complaint with violations of 18 U.S.C. § 875(c) (Interstate Communication of Threats); D.C. Code § 7-2502.01(a) (Possession of Unregistered Firearm); D.C. Code § 7-2506.01(a)(3) (Possession of Unregistered Ammunition); and D.C. Code § 7-2506.01(b) (Possession of Large Capacity Ammunition Feeding Devices). *See* ECF, 1. A federal grand jury returned an indictment charging Defendant with the same offenses on February 26, 2021.  It returned a superseding Indictment on April 2, 2021, which narrowed the charge under 18 U.S.C. § 875(c), alleging that Defendant threatened to injure (not kidnap) Speaker of the House Nancy Pelosi. *See* ECF 1, 17, 28. On September 10, 2021, Defendant pled guilty to one count of making threats in violation of Title 18 U.S.C. § 875(c). *See* ECF, 46.

## IV.    Statutory Penalties

Defendant now faces sentencing on a single count of violating 18 U.S.C. § 875(c).  As

noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 5 years imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

### V.      Defendant's Conduct Evidenced An Intent to Carry out His Threats

Section 2A6.1(b)(1) states that "[i]f the offense involved any conduct evidencing an intent to carry out such threat, increase [the offense level] by 6 levels."  U.S.S.G. § 2A6.1(b)(1). "The burden is on the government to prove facts in support of a sentence enhancement by a preponderance of the evidence." *United States v. Washington*, 115 F.3d 1008, 1010 (D.C. Cir. 1997); *United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016) ("The Government must demonstrate that a sentencing enhancement is warranted by a fair preponderance of the evidence . . . though that evidence may be circumstantial. . . .")  "Any acts that evidence an intent to carry out the threats on which a conviction is predicated, whether committed prior to or following such threats, may form the basis of the § 2A6.1(b)(1) adjustment." *United States v. Gary*, 18 F.3d 1123, 1128 (4th Cir. 1994); *United States v. Sullivan*, 75 F.3d 297, 301 (7th Cir. 1996) ("The mere fact that conduct occurred prior to the issuance of a threat should not place that conduct beyond the district court's consideration as it attempts to gauge the seriousness of a threat and the likelihood that it will be carried out.")  "The pivotal inquiry when determining the appropriateness of a § 2A6.1(b)(1) enhancement is whether the defendant intended to carry out the threat, and the likelihood that he would actually do so." *United States v. Newell*, 309 F.3d 396, 400 (6th Cir. 2002), citing *Gary,* 18 F.3d at 1127–28 (4th Cir.1994). The Court can apply the enhancement even if Defendant could not carry out his threats. *United States v. Hagar*, 822 F. App'x 361, 373–74 (6th Cir. 2020), *cert. denied,* 141 S. Ct. 1115, 208 L. Ed. 2d 557

(2021)("just by the fact that he was apprehended before any of these things could be acted out is probably not dispositive ... but ... there's plenty of evidence to show that this enhancement applies.")  The enhancement under § 2A6.1(b)(1) "is intended to punish more severely those threats which, but for the intervention of law enforcement, would likely have been carried out." *Sullivan*, 75 F.3d at 302 (7th Cir. 1996).  "The fact that the Defendant did not direct his message to a particular person makes no difference with respect to this element." *United States v. Baker*, 514 F. Supp. 3d 1369, 1378 (N.D. Fla. 2021). *See id*. ("'The language of § 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce.'") (quoting *United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001). *Accord*, *United States v. Martin*, 163 F.3d 1212, 1216 (10th Cir. 1998). In fact, it would make little sense for Defendant to inform his victim of his threat if he meant to carry it out.

Defendant's actions in this case clearly involved conduct evidencing an intent to carry out his threat, and warrant application of the 6-level enhancement under Section 2A6.1(b)(1). Instead of leaving D.C. after the riots that occurred at the Capitol, Defendant told his friend on January 7th that he was "[s]taying one more day since I got here late, need to FK with these commies." He also threatened that he was "[t]hinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV." Defendant's mother contacted the FBI because she understood Defendant had advanced his threats from talk to action. The target of Defendant's threats, Speaker of the House Pelosi, was present in D.C. to certify the election on January 6, 2021 and made a speech the following day about the riot. https://youtu.be/dY8Wtr8mo5M (January 6, 2021) and https://youtu.be/PKsbFHseIJ8 (January 7,

2021, at 1:14:47 minutes of the video). *See United States v. Bohanon*, 290 F.3d 869, 875 (7th Cir. 2002) (defendant's "references [to] the location where, and manner in which, he intended to harm the Walkers and their niece . . . provides an indication that [he] had moved beyond mere 'talk ... to talk which evidences an intent to act.'") (quoting *Sullivan,* 75 F.3d at 302.)

This case is analogous to *United States v. Barbour*, 70 F.3d 580 (11th Cir. 1995) where Barbour drove to Washington, D.C. to kill the President, left Washington D.C. when he realized the President was not there, and then revealed to others that he wanted to kill the President. The Court analyzed Barbour's pre-threat conduct, including driving to Washington D.C. with a gun and one-hundred rounds of ammunition and waiting to kill the President. The Court considered "the proximity in time between the threat and the prior conduct, the seriousness of defendant's prior conduct, and the extent to which the pre-threat conduct has progressed towards carrying out the threat." *Id*. at 587.  The Court upheld application of the 6-level enhancement under Section 2A6.1(b)(1), reasoning that "[l]ess than two weeks prior to his threats, Barbour was in Washington, D.C., with one hundred rounds of ammunition, waiting to assassinate the President." *Id*.

Defendant's pre-threat conduct, driving hundreds of miles with a vast arsenal to carry out his threat, was powerfully indicative that his threat was not idle. He stayed at a hotel approximately one mile from the Capitol where Speaker of the House Pelosi works.  Defendant was only denied the opportunity to carry out his threat because he was arrested, not because he changed his mind.  *See* Barbour, 70 F.3d at 587 (affirming application of § 2A6.1(b)(1) enhancement where "Barbour never deviated from his plan to kill the President; he was just denied the opportunity.") Probation correctly concluded that the § 2A6.1(b)(1) enhancement

13

applies, and so should this Court.[4]

## VI.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In addition to the Guidelines range, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

Defendant set out from Colorado driving to D.C., where the electoral certification vote was taking place, and where ensuing riots at the Capitol occurred on January 6, 2021. As Defendant drove to D.C. he expected that violence was going to occur there, and intended to participate in it,

---

[4] Because U.S.S.G. § 2A1.6(b)(1) applies, the four-level reduction in U.S.S.G. § 2A1.6(b)(6) does not. *See United States v. Anderson*, 474 F. App'x 672, 673 (9th Cir. 2012) (four-level reduction not available when another enhancement under Section 2A6.1(b) applies).  Defendant is independently precluded from the four-level reduction under Section 2A6.1(b)(6) because his offense did not "involve[] a single instance evidencing little or no deliberation." U.S.S.G. § 2A1.6(b)(6).  Section 2A6.1(b)(6) does not apply where "there is evidence of some planning or some effort to carry out the threat." *United States v. Wright-Darrisaw*, 781 F.3d 35, 41 (2d Cir. 2015).  As noted above, Defendant engaged in extensive planning and efforts to carry out his threat, including driving from Colorado to Washington, D.C. with multiple firearms and ammunition and staying at a hotel within one mile of where his intended victim was located.

threating that, "We're going to surround DC (sic) and slowly constrict." and that he was, "[r]eady to remove several craniums from shoulders . . . (and) gonna collect a shit ton of Traitors heads." *See* Exhibit 1. Defendant arrived in D.C. after the breach of the Capitol, but started inflicting the violence that he threatened, when on January 7, 2021, he assaulted someone, headbutted him, and continued to punch the victim "while he was on the ground." Ostensibly, despite getting out of his truck and confronting the victim, Defendant claims that he was not the aggressor in this incident. PSR ¶ 43 (charged conduct in pending prosecution in the Washington D.C., Superior Court).

With that backdrop, while Defendant was in a hotel that he checked into, he warned that he was, "Strateginz (sic) . . .on best way to assault this city . . . ." He also said that he was "[s]taying one more day since I got here late, need to FK with these commies" and that he was, "[t]hinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV." Defendant predicted ominously that "I ain't goin to jail, the morgue maybe, not jail."

Defendant's relative, who knows Defendant well, understandably took his threats seriously. PSR, ¶ 12.  Defendant's relative contacted Defendant's mother, who, knowing her son's violent past, and recognizing that he had been indoctrinated in alleged conspiracy theories, contacted the FBI because she was concerned that Defendant may harm others and himself. PSR, ¶ ¶ 12, 53. The FBI found Defendant in a hotel room approximately one mile from the Capitol, with the telephone that he used to text his threats and with a trailer parked outside of the hotel, which contained weaponry that Defendant could use to follow through with his threats. *See* ECF 25, at 6. To his credit, Defendant interviewed with the FBI and provided consent to search his hotel room, trailer, and truck.

### B.   The History and Characteristics of the Defendant

Defendant is 53 years old and a resident of Hayesville, North Carolina. PSR, (Identifying Data).  He is also a college graduate and earned a Bachelor of Art degree in Economics. PSR, ¶ 74. At the time of the instant offense, he was unemployed. Nonetheless, he owns numerous cars, trucks, and motorcycles, and has a significant net worth. PSR, ¶ 85.

Probation notes that Defendant has mental and emotional health issues and has repeatedly sought treatment for those problems. PSR, ¶¶ 63 – 69.   Defendant's mother noted that Defendant has a diagnosed mental health disorder, but he has refused treatment for it.  *See* FBI FD-302, Serial 17 of W.M., at 2-3, produced to this Court under seal with Government's Supplemental Support in Opposition to Defendant's Motion to Revoke Magistrate Judge's Order of Detention Pending Trial and Setting Conditions of Release, which the Government hereby incorporates by reference. Additionally, the Defendant's mother explained to the FBI that shortly before the events in this case, Defendant had failed to follow through on mental health treatment proposed by his family. *Id*.

Although Defendant has no criminal convictions, he has a history of violence and reckless conduct.  Defendant has assaulted his father twice, once attacking him and another time pushing his father's head through a window during an argument. *See* FBI FD-302, Serial 17, at 2.

Defendant was arrested in 2005 for battery and simple assault. PSR, ¶ 39.  In 2012, he was charged with aggressive driving. PSR, ¶ 40.  Both cases were dismissed via *nolle prosequi*. *Id*.

In 2018 in Georgia, Defendant was involved in another road rage incident. He allegedly pointed his firearm at the other driver and his daughter.  Defendant was questioned by the police and admitted to pointing his firearm at the other driver's vehicle in frustration. *See* PSR, ¶ 42(a)

and ECF *26,* Ex. 2, at 2 filed under seal. No charges were sought in this case. Also, in 2018, Defendant was issued a citation for firing a gun in a busy commercial area, in violation of a municipal ordinance. Defendant claimed that he was just shooting at a safe for target practice.  *See* PSR, ¶ 42(b) and ECF 26, Ex. 3, filed under seal.

On January 7, 2021, the same day as his instant criminal threat, Defendant assaulted a person in Washington, D.C. According to an affidavit submitted to the Superior Court of the District of Columbia in support of a search warrant, the Defendant exited his vehicle, head-butted the complainant, knocked him to the ground, and assaulted him on the ground.  *See* ECF 26, Ex. 1, filed under seal. As part of the plea bargain, this case will be dismissed. Given the Defendant's claim of self-defense, however, it is critical that the Court assess the underlying facts as part of this sentencing.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense.

Threating to kill anyone is serious. Threats to harm political figures has become all too common. The riot at the Capitol on January 6th included individuals who threatened to hang Vice-President Pence and others who searched for Speaker of the House Pelosi. (*See* https://www.mercurynews.com/2021/01/11/capitol-assault-a-more-sinister-attack-than-first-appeared/v, ("'Hang Mike Pence!' the insurrectionists chanted as they pressed inside, beating police with pipes. They demanded House Speaker Nancy Pelosi's whereabouts, too. They hunted any and all lawmakers: 'Where are they?' Outside, makeshift gallows stood, complete with sturdy wooden steps and the noose. Guns and pipe bombs had been stashed in the vicinity."); *See* https://www.cbsnews.com/news/infrastructure-bill-fred-upton-threats-voicemail/, ("After voting

in favor of the $1.2 trillion bipartisan infrastructure bill on Friday, Republican Congressman Fred Upton of Michigan received a threatening voicemail in which the caller repeatedly called him a "traitor" and said he hopes the congressman, his family and staff all die.")

As Defendant hurled his threats, his friends and family who received his texts warned him that his communications may have been monitored, but Defendant responded with vitriol.  After he made the threat to shoot Speaker of the House Pelosi, he exclaimed, "You get that one Mr. Marxist FBI Agent? Go FK yourself".

To potentially carry out his threats, Defendant brought his firearms and loads of ammunition in D.C.  He readily admitted to the FBI that he knew that he could not legally possess them in D.C. without the proper registration, showing his disdain for the law, and willingness to break it to further his purpose.

A significant sentence of incarceration within the guidelines will reflect the seriousness of this offense, promote respect for the law, and provide just punishment.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration as threats to physically harm, or kill individuals, because of their viewpoints or occupation become more prominent.(*See* https://www.cbsnews.com/news/federal-judge-threats-attack-60-minutes-2021-05-30/. ("Federal

judges call for increased security after threats jump 400% and one judge's son is killed".) *See* https://www.rollingstone.com/politics/politics-news/jan-6-judges-threats-vinson-sentencing-1246438/, ("D.C. District Judge Reggie B. Walton said that he and other judges involved in Jan. 6 trials 'are getting all kinds of threats and hostile phone calls' from people who 'buy in on this proposition … that somehow the election was fraudulent,'") A significant sentence here will serve as a general deterrent to those who may choose to physically harm those with whom they disagree and encourage a more civil way to address their grievances.

*Specific Deterrence*

Defendant's text messages evidencing his intent to kill clearly demonstrate the need for specific deterrence.  Defendant defiantly threatened to use his vast weaponry to engage in "target practice" when he arrived in D.C., even as his friends and family tried to stop him. Undaunted, Defendant continued to spew his threats, and potential catastrophe was only averted because Defendant's mother contacted law enforcement officials. A sentence here, keeping Defendant away from others that he may threaten and harm is warranted to deter him from repeating his actions.  This is so even in light of his ongoing mental health concerns, which exacerbate the unpredictability of Defendant's actions.

### E.  The Need to Protect the Public From Further Crimes of the Defendant

While Defendant has no criminal convictions, he has several documented violent encounters, ranging from the instant offense and threatening to kill others; his road rage incidents on January 7, 2021 in which he assaulted a man, in 2018, when he pointed a firearm at someone; in 2005, when he was arrested for battery and simple assault; and assaulting his father twice,

including pushing his head through a window.  A significant term of imprisonment is clearly warranted here to protect the public from further crimes, and violence, from the Defendant.

### F.  The Need to Avoid Unwarranted Sentencing Disparities

Here, to avoid unwarranted sentencing disparities, the Court should also consider the sentences imposed in *United States v. Sherbow*, 1:13-cr-00271-RBW, *United States v. Ross*, 1:06-cr-00100-JDB, *United States v. Coleman*, 1:15-cr-00068-APM, *United States v. Caporusso* 1:20-cr-00171-TNM, and *United States v. Timmers*, 1:05-cr-00073-EGS where Courts in this district sentenced defendants to low or mid-range sentences in threat cases. To be clear, while the disparity analysis is not limited to a single district, these cases are nevertheless instructive.

In *Sherbow*, defendant was convicted of two counts of violating 18 U.S.C. § 875(c) for threatening, via email and telephone calls, to kill Congresswoman Tulsi Gabbard.  The Court sentenced the defendant to 33 months imprisonment, which was at the low end of the 33-to-41-month guideline range.

In *Ross*, the defendant pled guilty to making Threats Against the President, via email and physical mail, in violation of Title 18 U.S.C. § 871. The Court sentenced the defendant to 21 months, in the middle of the 18-to-24-month guideline range.

 In *Coleman*, the defendant pled guilty to making Threats Regarding Explosive Materials, via repeated telephone calls to 911, in violation of Title 18 U.S.C. § 844(e). The Court sentenced him to 21 months, at the bottom of the guideline range of 21 to 27 months.

In *Caporusso*, the defendant pled guilty to Influencing, Impeding, or Retaliating Against a Federal Official by Threat in violation of 18 U.S.C. § 115 (a)(1)(B), via threats that he made in a

voicemail that he was going to kill a federal judge. The Court sentenced defendant to 18 months, at the bottom of the guideline range of 18 to 24 months.

In *Timmers*, the defendant pled guilty to making Threats or Maliciously Conveying False Information to Destroy Property by Means of an Explosive in violation of Title 18 U.S.C.§ 844(e) by driving his van one block from the White House and threatening to destroy it. The Court sentenced defendant to 34 months imprisonment, the mid-point range of the 31-to-37 month guideline range.

At this time, no unwarranted sentencing disparities exist, nor does the Government's sentencing recommendation request create one.

## VII.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, all the factors here support a sentence of incarceration. As such, the Government recommends that this Court sentence Defendant to a sentence within the mid-guideline range of the Court-decided guidelines.  The Government also recommends 3 years of supervised release regardless of what guideline range the Court determines is legally appropriate. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing that he willingly spoke with the FBI upon his arrest, and has endured meaningful mental health issues.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney


By:     */s/ Anthony L. Franks*
        ANTHONY L. FRANKS
        Assistant United States Attorney
        United States Attorney's Office for the
        District of Columbia
        Detailee – Federal Major Crimes
        555 4th Street, N.W., Room 5503
        Washington, D.C. 20530
        (314) 539-3995
        Anthony.Franks@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon counsel of record by the filing of same in ECF on December 8, 2021

/s/ Anthony Franks
ANTHONY FRANKS
Assistant United States Attorney