**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   **Crim. No. 1:21-cr-00159 (ABJ)** |
| | )   **(REDACTED)** |
| CLEVELAND G. MEREDITH, JR. | ) |
| | ) |
| Defendant | ) |
| | ) |

**DEFENDANT MEREDITH'S**
**MEMORANDUM IN AID OF SENTENCING**

Defendant Cleveland Grover Meredith, Jr. comes before the Court for sentencing after pleading guilty to one count of Interstate Threats in violation of 18 U.S.C. § 875(c). Pursuant to Title 18 U.S.C. § 3553(a), Fed. R. Crim. P. 32 and Section 6A1.2 of the *United States Sentencing Guidelines*, Defendant Meredith, through undersigned counsel, hereby sets forth his position as to the sentencing factors to be relied upon at sentencing. For the reasons set forth herein, Mr. Meredith submits that a sentence of time-served followed by three years of supervised release is consistent with the sentencing factors and goals set forth in Title 18 U.S.C. § 3553.

## I.   BACKGROUND

Cleveland Grover Meredith, Jr., 53 years old, is originally from Atlanta, Georgia and is the eldest of three children. His parents, Cleveland Grover Meredith, Sr. and Wendy Meredith, provided him a secure upbringing and education. PSR at ¶48. A star athlete in high school, Mr. Meredith went on to graduate from the University of the South in Sewanee in 1990 before locating to the West and later back East to pursue various jobs. PSR at ¶79. However, despite the veneer of normalcy in these early years, two profoundly traumatic events left Mr. Meredith deeply scarred and provide critical context in understanding him and the downward trajectory that led to the instant offense.

First, when he was between 6-9 years old, ██████████████████████████████ ████████████████████████████████████████████ PSR at ¶49. This so traumatized him that he did

1

not reveal ███████ until he was 50 years old, and only in the context of seeking treatment from a treating psychologist.  PSR at ¶49.  At that time, prior to the instant offense, Mr. Meredith was diagnosed with PTSD ██████████████████████

Second, Mr. Meredith's younger sister Emily died of a brain tumor when Mr. Meredith was in his early 20s.  PSR at ¶53.  Mr. Meredith and Emily, the "star" of the family, were very close.  Per Wendy Meredith, Emily's death changed the course of Mr. Meredith's life and his sense of identity – indeed, he has often told others that he should have been the one to die.  PSR at ¶53.  In the wake of Emily's death, Mr. Meredith struggled to find a sense of purpose and significance, and sought counseling for his grief which he continued with on and off for several years.

Following Emily's death, and throughout his 20s and into his early 30s, Mr. Meredith pinballed between different jobs, working for his family's business, a  ski resort, a brokerage firm and a real estate firm.   PSR at ¶¶75-84.  In 2001, he married Elizabeth Meredith (Taft), a union which initially provided much needed purpose and stability for Mr. Meredith.  They had two boys, Taft and Teddy.  PSR at ¶51.  Photos from the early years of the marriage attest to the beauty and potential of this young, growing family.  Exh. 1, Sample photographs.

From 2000 to 2012, Mr. Meredith owned and operated Car Nuts Auto Spa in Smyrna, Georgia, where he supervised some 30 employees before the business went into bankruptcy.  In 2013, he owned and operated another car business, Car Nutz Carwash in Ackworth, Georgia, which he later sold in 2019.  PSR at ¶¶77-78.

However, throughout these years, Mr. Meredith remained plagued with deepening, largely untreated mental health issues.  As noted above, initially he had sought counseling in connection with his sister's death.  ██████████████████████████████████

███████  PSR at ¶64. But by his mid 40s, Mr. Meredith's mental health had worsened and his life

began to fall apart.  He became deeply depressed, no doubt from his undisclosed childhood trauma, his sense of guilt and loss of purpose from his sister's death and his own sense that he had not "measured up" as compared to his high school friends with highly successful professional careers.  Mr. Meredith confided repeatedly to his mother that he felt he had no purpose in his life, despite his personal and business successes.  PSR at ¶53.  Looking back, his mother describes this time as her son's "heartbreaking decline."  PSR at ¶53.  ███████████████████

█████████████████████    █████████████████████████████████

█████████████████

By 2019, Mr. Meredith's worsening mental health had led to divorce.  PSR at ¶50.  He and Ms. Taft Meredith share joint custody of their sons; both boys reside with Ms. Taft Meredith and are thriving as good students and committed athletes.  PSR at ¶50.  Mr. Meredith has remained a dedicated father, often paying substantially more in child support each month than required by his divorce agreement.  PSR at 26.  And despite their divorce, Ms. Taft Meredith continues to describe Mr. Meredith as "the kindest person" and "an excellent father." PSR at ¶52, but explains that the couple's marriage simply could not survive what she describes as an "eight-year decline" in Mr. Meredith's mental health and his burgeoning "extremism with politics and guns."  Per Ms. Taft Meredith, Mr. Meredith was a "living dichotomy" who was in "the prime place to be swept up into something" like the instant offense.  PSR at ¶52.

Ms. Taft Meredith's observations are squarely on point and echoed by Mr. Meredith's subsequent mental health history and diagnoses.  In October 2019, Mr. Meredith began seeing Galen Cole, Ph.D., a well-regarded psychologist in the Atlanta area.  It is to Dr. Cole that Mr. Meredith first revealed ████████████████████████████  Dr. Cole diagnosed Mr. Meredith with ███████████████████████████████  Exh. 2, Report by S. Xenakis, MD at 5.  According to notes from Dr. Cole obtained by Probation, Mr. Meredith

sought counseling ████████████████████████████████████████████████
and was ████████ and needed ████████ in order to ████████████████ PSR at ¶67.
Dr. Cole indicated that Mr. Meredith is ████████████ who is ████████████████
████████ and is ████████████████ PSR at ¶67.   Dr. Cole's notes further indicate
that Mr. Meredith ████████████████████ which has ████████████████
████████████████████████ Dr. Cole's later notes reflect that Mr. Meredith
needed to ████████████████████ and focus more on ████████████████
████████ PSR at ¶67.   Mr. Meredith ended his counseling with Dr. Cole in February 2020.  PSR
at ¶67.



In September 2020, Mr. Meredith relocated from Georgia to Hayesville, North Carolina.
PSR at ¶55.  It was during this period – in his state of loss, confusion and depression – that Mr.
Meredith became more deeply immersed in QAnon and, based on his personal experience, found
resonance in its propagandized themes of ████████████ He became increasingly vocal and
hostile in his political views, alienating his family and life-long friends.  Ironically, it was in the
extreme and distorted conspiracy theories of QAnon and its angry call to action that Mr. Meredith
felt he had found the illusory sense of purpose and meaning that had eluded him.

Around this same time, Mr. Meredith suffered a concussion from a serious motorcycle
accident – he was thrown some 450 feet off the road and blacked out for at least 15 minutes.  This
was the most recent in a series of significant concussions Mr. Meredith had suffered.  Dr. Stephen
Xenakis, the expert witness retained by the defense, addresses in his report how this series of
concussions may have impaired Mr. Meredith's judgment in relation to the instant offense.  Exh.
2, Report by S. Xenakis, MD at 6.

At the time of his arrest in January 2021, Mr. Meredith was trying to regain his footing by
starting a motorcycle training and touring company on his property.  PSR at ¶60.  He had begun

bulldozing portions of the property and was developing a business plan for the venture.  PSR at ¶60.

While incarcerated, Mr. Meredith has been diagnosed with depression, anxiety, and ADHD and is taking prescribed medications.  PSR at ¶69.

It is in this context that the instant offense needs to be considered.

## II.    INSTANT OFFENSE

In late December 2020, Mr. Meredith left for Colorado in a pickup truck and trailer to join his ex-wife and two boys for the holidays.  The plan was to go skiiing but weather reports gave him concern that there might not be enough snow.  So he brought with him weapons that he had used before with his sons for target practice – weapons he had acquired legally and had a permit to carry.  He also brought several ATVs that he had purchased for the motorcycle business he was starting.  Mr. Meredith thought he could do target practice with his sons and play around on the ATVs if they could not ski.

Mr. Meredith headed from Colorado to the District to attend the pro-Trump rally that was scheduled for January 6, 2021.  PSR at ¶11.   His plan was to stay in the District for the rally and then head on home to North Carolina.  Mr. Meredith had attended a pro-Trump rally in the Fall of 2020 in the District without incident.  As he was driving to the District, he had car trouble and was not able to make the rally outside the U.S. Capitol.  He was, however, listening intently to reports about the events that were unfolding at the U.S. Capitol on January 6, 2021.  Mr. Meredith arrived late to the District on January 6, 2021 and checked in to a hotel.  PSR at ¶11.

The next day, January 7, 2021, Mr. Meredith was driving to mail a package when he had an altercation with a driver blocking access to the FedEx office.  Mr. Meredith was later charged with Simple Assault in relation to this incident.  PSR at ¶43.   Per Mr. Meredith, the complaining witness was the aggressor in the interaction, spurred on by Mr. Meredith's "MAGA" hat, and Mr.

Meredith was acting to defend himself.  Mr. Meredith was fully prepared to defend his actions, had the matter proceeded to trial.

Later that day, while at his hotel, Mr. Meredith sent a text message in interstate commerce to his uncle who was then in Georgia.  The text message stated that he was, "[t]hinking about heading over to Pelosi C[**]T's speech and putting a bullet in her noggin on Live TV [purple devil emoji]."  PSR at ¶11.   Mr. Meredith's uncle contacted Mr. Meredith's mother, who then contacted the FBI.  PSR at ¶12.  As Mrs. Meredith is expected to explain at the sentencing hearing, she was distraught from seeing the events that had unfolded at the US Capitol; had been estranged from her son and alarmed by his extremist political postings on social media; was aware he had been suffering from mental health issues; and was concerned that he was heading into a maelstrom where further violence might erupt.  Her concern was not that Mr. Meredith was capable of, or intent on, actually carrying out any kind of threat on Speaker Pelosi, but rather that he might find himself in the midst of an unpredictable, chaotic situation where he could be thrusted into violent interactions.

At 7:24 pm that evening, Mr. Meredith texted Ms. Taft Meredith that he was planning to drive home the next day.  Exh. 3, Text Message Exchanges from C. Meredith, Jr.   Shortly thereafter, Mr. Meredith was watching TV when he heard a knock at his door – the FBI.   Mr. Meredith was fully cooperative with the FBI agents, acknowledged that he had weapons which were secured offsite in his trailer and gave consent for them to search the trailer.  The FBI agents searched the trailer and found a handgun and IWI Tavor X95 rifle, along with a large amount of ammunition and 10 large-capacity ammunition feeding devices.  The FBI agents also examined Mr. Meredith's cellular phone and found numerous text message exchanges between Mr. Meredith and friends and family during the period January 4-6, 2021, as detailed in the PSR.  PSR at ¶¶14-18.

There is no evidence that Mr. Meredith took any steps while in the District to follow up on his threat to Speaker Pelosi – no efforts to, for example, determine her whereabouts or schedule, no inquiries to her office, no surveilling of her movements, no removal of the weapons from their secure location in the trailer – as would be typical for any person intent on carrying out such a threat. *See* Exh. 2, Report by S. Xenakis, MD at 10.  Indeed, he had texted his former wife that he was planning to head home the next day, yet further indication that he had no intent whatsoever of following through on his threatening language.  Mr. Meredith was taken into custody by the FBI agents that evening.

### III.    INDICTMENT & PLEA

On April 2, 2021, a federal grand jury in the District of Columbia returned a four-count Superseding Indictment charging Mr. Meredith with Interstate Communication of Threats, in violation of 18 USC § 875(c) (Count One), Possession of Unregistered Firearm, in violation of 7 DC Code § 2502.01(a) (Count Two), Possession ofUnregistered Ammunition, in violation of 7 DC Code § 2506.01(a)(3) (Count Three) and  Possession of Large Capacity Ammunition Feeding Device, in violation of 7 DC Code § 2506.01(b) (Count Four).

On September 10, 2021, Mr. Meredith pled guilty to Interstate Communication of Threats in violation of 18 USC § 875(c) pursuant to a written Rule 11(c)(1)(B) plea agreement.  During the plea colloquy, he acknowledged that a conviction for a violation of 18 USC § 875(c) carries a maximum sentence of five years imprisonment; a maximum fine of $250,000; a term of supervised release of not more than three years; an obligation to pay any applicable interest or penalties on fines and restitution not timely made; and a $100 special assessment.  The Government agreed to request that the Court dismiss the remaining counts of the Indictment and the Information in the Simple Assault case, DC Superior Court Case No. 2021 CMD 0695, at the time of sentencing.

Since his arrest, Mr. Meredith has endured an arduous confinement at the Correctional

7

Treatment Facility in the District ("CTF"), made all the worse by inflammatory mischaracterizations that have disgraced his name and destroyed any possibility of a professional career commensurate with his education and business accomplishments.

The sentencing hearing in this matter is set for December 14, 2021. As of the time of sentencing, Mr. Meredith will have been imprisoned for 11 months, 7 days.

## IV.   PLEA AGREEMENT

The Government and defense painstakingly negotiated the Plea Agreement in this matter over a period of months. As set forth in the Plea Agreement, the parties agreed that a Base Offense Level of 12 applies, per USSG 2A6.1(a)(1). Plea Agreement at 3. The Plea Agreement then states that the Government "intends to seek a six-level enhancement pursuant to 2A6.1(b)(1)" because the offense allegedly involved "conduct evidencing an intent to carry out such threat." *Id*. There is no reference to any additional enhancement that the Government intends to seek. *See generally* Plea Agreement. The Plea Agreement specifies, "Depending on the application of 2A6.1(b)(1), *the total offense level will be either 18 or 12*." *Id*. at 3  (Emphasis added). There is no reference to any total offense level beyond 18 or 12. After addressing applicable reductions, the Plea Agreement then goes on to conclude: "In accordance with the above, the Estimated Offense Level *will be* either 15 or 10." *Id*. Thus, the Plea Agreement lays out two applicable guideline ranges – 6-12 months (if no 6 point enhancement re intent to commit threatened conduct) and 18-24 months (if this enhancement applies). The Plea Agreement further specifies that "a sentence within the above-mentioned Estimated Guideline Ranges" would "*constitute a reasonable sentence*" in light of all the factors set forth in 18 USC § 3553(a), with the caveat that either party may seek a variance and suggest that the Court consider a sentence outside these applicable Guideline ranges based upon factors to be considered in imposing a sentence pursuant to 18 USC § 3553(a). *Id*. at 5. While the Plea Agreement reserves the right to allocute for a sentence within the Guideline range ultimately

determined by the Court, *id.*, there is no provision that contradicts the assertions that a sentence with a total offense level of 15 or 10 is what is reasonable or that suggests that the Government intends to seek an enhancement beyond these offense levels.

The U.S. Probation Office ("Probation") has determined in its Presentence Investigation Report ("PSR") that two 6-point enhancements apply: one on the basis that there is evidence of an intent to carry out the subject threat, per USSG § 2A6.1(b)(1), and the second on the basis that Speaker Pelosi is a government official, per USSG § 3A1.2(a)(1). PSR at ¶¶26-27. Defendant, through undersigned counsel, submitted to Probation detailed objections to both 6-point enhancements, but Probation continues to maintain that both enhancements are applicable. PSR at 24-27. Per the PSR, these two 6-point enhancements would bring Mr. Meredith advisory Guideline range to 36-47 months. PSR at ¶103. In its Sentencing Recommendation dated December 8, 2021, Probation has recommended a sentence of 30 months, a variance from the Guidelines range based on Defendant's mental health issues. Sentencing Recommendation at 1. Nonetheless, Mr. Meredith believes that this recommended sentence is still grossly disproportionate to the offense conduct to which he has pled guilty.[1]

V.    **STATUTORY SENTENCING FACTORS**

Per 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of the statute. *See* United States v. Shortt, 485 F.3d 243, 248 (4th Cir. 2007). In undertaking its analysis, the Court is to give consideration to the advisory sentencing range

---

[1]   Despite the fact that Speaker Pelosi's status is hardly new information, and despite the crystal clear understanding between the parties of the two applicable sentencing ranges, the Government has now indicated to undersigned counsel that it may allocute for a sentence in this higher range if the Court finds such a range applies. Defendant believes that such a position by the Government would constitute a breach of the plea agreement and reserves all rights. *See, e.g.*, US v. Palladino, 347 F.3d 29 (2d. Cir. 2003); US v. Murray, 897 F.3d 298 (D.C. Cir. 2018).

recommended by the Guidelines and any relevant Guideline policy statements, as well as other traditional sentencing factors, including (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment and affords adequate deterrence; (4) a sentence that provides the defendant with needed medical/mental health care; (5) the kinds of sentences available; (6) the need to provide restitution to any victims; and (7) the need to avoid unwarranted sentencing disparities between defendants with similar records convicted of similar conduct. *See* 18 U.S.C. § 3553(a).

Nearly twenty years after the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). The Guidelines are no longer "the only consideration" at sentencing. Gall v. United States, 552 U.S. 38, 49 (2007). Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Id.*; *accord* Cunningham v. California, 549 U.S. 270 (2007). While a sentencing court must consider the Guidelines as a starting point, a court should not presume "that the Guidelines range is reasonable." Gall, 552 U.S. at 50. Instead, the Court is to impose sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case.*Id. See also* United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.").

Per 18 U.S.C. § 3553(a), the Court can take into account the particularized factors of the entirety of Mr. Meredith's life and not just his criminal conduct. This approach is consistent with 28 U.S.C. § 991(b)(1)(B) which provides sentencing courts with discretion to "maint[ain]

sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." Indeed, the circumstances of this case along with Mr. Meredith's personal history, exemplify why the Supreme Court restored a sentencing court's discretion "to consider every convicted person as an Individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted).   The factors addressed below, both individually and in combination, support that a sentence of time served is punishment "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." Kimbrough v. United States, 552 U.S. 85, 111(2007).

**1.   The Nature and Circumstances of the Offense**

While Mr. Meredith has acknowledged that he made the subject threat against Speaker Pelosi, the circumstances of that threat are significantly mitigating.   This additional context is needed in order to fully understand the nature of the subject text message.

First, this was a threat communicated in the midst of rapid texting with friends and family, PSR at ¶¶14-18, persons Mr. Meredith believed he could talk to in rough, familiar, extreme terms. The instant threat was made specifically when texting *with his own uncle*.   As such, this threat had none of the markings of a calculated, deliberative communication of intent to inflict harm.   To the contrary, as explained in the Statement of Facts in support of the Arrest Warrant, the relevant text messages include statements by Mr. Meredith that suggest that he was joking ("Lol, jus havin fun"); that the FBI was aware of him and monitoring his activities; and that he was not to be taken seriously in relation to his statements ("My Spy name is: DoubleODipshit").   Statement of Facts in Support of Arrest Warrant at 1.   Indeed, Mr. Meredith did not attempt to any degree to deliver the threat personally to Speaker Pelosi in order to induce fear or post the threat online to publicly instill

alarm.

Second, the nature of current political discourse has led to rampant use of inflammatory rhetoric.  Hyperbolic speech that crosses the line into threats is, unfortunately, commonplace, particularly on social media.  Examples of such rhetoric across the political spectrum abound, from comedian Kathy Gifford doing a mock beheading of then-President Trump to Johnny Depp asking "When was the last time an actor assassinated a president?" to conservative websites that employ violent rhetoric to demonize political opponents.  *See, e.g., Violent Rhetoric Grew More Mainstream in Conservative, Intellectual Circles*, NPR, (Jan. 28, 2021) https://www.npr.org/2021/01/28/961470082/violent-rhethoric-grew-more-mainstream-in-conservative-intellectual-circles.  The  appetite for insulting and even threatening content that has emerged over the past few years certainly has blurred the bounds of decency, much less of law, in regards to political speech.  This reality does not excuse Mr. Meredith conduct, but it does help explain its genesis.

Third, the very nature of texting and social media promotes rapid, reflexive, unthinking, extreme speech.  As explained in a recent law review article, the "informality of much social media speech makes it more akin to chitchat rather than written communication, and this feature leads speakers to post things that they would never contemplate putting in writing in other contexts." Lidsky, L, *#I U: Considering the Context of Online Threats*, 106 California Law Review 1885, 1903 (2018).  Moreover,  the "informal, spontaneous, often anonymous, and unmediated discourse common in social media magnifies the potential for incendiary language," and "speakers respond to provocations before good sense can assert itself."  *Id*.

Fourth, Mr. Meredith was clearly "hyped up" by the events of at the U.S. Capitol on January 6, 2021 when he sent the subject text.  We all watched in disbelief as the U.S. Capitol was breached and the nation later struggled to grapple with what had occurred.  For Mr. Meredith, these events

were a rousing vindication of his belief that the election had been "stolen."  Regardless of how one might see his views, there is no question that he was in a highly emotional state when he sent the instant text message.

█████████████████████████████████████████████████████████

██████████████████████████ – again, not an excuse, but important context in assessing his threatening statement.  Exh. 2, Report by S. Xenakis, MD at 8.  Indeed, the FBI recovered █████████████████████████████ when Mr. Meredith was arrested.  In addition, he had recently suffered the concussion from the motorcycle accident which, per Dr. Xenakis, may have impaired his judgment and ability to exercise restraint in his speech. Exh. 2, Report by S. Xenakis, MD at 10.

### a.   A 6-point Enhancement per USSG § 2A6.1(b)(1) is Unwarranted

The 6-level enhancement per USSG § 2A6.1(b)(1) for conduct evidencing an intent to carry out such threat is unwarranted.  *See* PSR at ¶[26.  First, Mr. Meredith's text message did not evince the deliberation that court's have found to indicate intent.  *See, e.g*, United States v. Harris, 763 F. Supp. 546, 549 (M.D. Ala. 1991) ("A brief examination of these letters reveals that Harris's death threats were pointed and unambiguous, and, indeed, grew more heated and enraged with the passage of time"); United States v. Taylor, 88 F.3d 938, 943 (11th Cir. 1996) (affirming six-level enhancement where many of the defendant's letters described "the [victims'] activities in a detail that seemed to indicate first-hand observation").  Rather, Mr. Meredith's text stated, without detail and sandwiched between explicitly joking commentary, that he was "thinking about" heading over to Pelosi's speech and putting a "bullet in her noggin."

Second, Mr. Meredith took no actions that would evidence such intent – he did not, for example, Google Speaker Pelosi's whereabouts ahead of time, contact her office to determine her schedule during the relevant time period or scope out the environs of the U.S. Capitol for access to

commit such an act.  Indeed, Mr. Meredith is "all talk," as he freely admits (referring to himself as "DoubleODipshit") and that is exactly what he has acknowledged by pleading guilty to this threat – that his words, not his actions, crossed the line.  Moreover, his contemporaneous texts, referenced above, conveying that he was "just kidding," directly counter any argument that he intended to carry out this threat.  Statement of Facts in Support of Arrest Warrant at 1.  Finally, the fact that he had weapons in his trailer when arrested is not determinative of intent.  United States v. Philibert, 947 F.2d 1467, 1471 (11th Cir.1991).  These are weapons that he had legally acquired and that he had taken with him to Colorado for a separate and legitimate purpose:  to have something to do with his sons in the event there was no snow for skiing.  There is no evidence that he purchased or acquired these weapons close in time to his issuance of the threat – a factor some courts have found to be persuasive on the issue of intent to carry out a threat.  *See, e.g.*, United States v. Kirsh, 54 F.3d 1062, 1073 (2d Cir. 1995) (affirming finding that "defendants' purchasing of firearms and inquiring about ammunition during the period in which they were sending letters threatening to shoot sufficiently evinced an intent to carry out their threats.")  And, as noted, Mr. Meredith had texted his former wife that he was going to drive home the next day, yet further indication that he had no intention of carrying through on his threat.  Exh. 3, Text Message Exchanges from C. Meredith, Jr.

### b.  A 6-point Enhancement per USSG § 3A1.2(a)(1) is Unwarranted

The 6-level enhancement per USSG § 3A1.2(a)(1) because the victim was a government officer is unwarranted.  *See* PSR at ¶27.  First, the Government itself failed to apply this enhancement to Mr. Meredith's threat.  Notably, the Government did not charge Mr. Meredith with Section 115(a)(1)(B), the criminal provision that specifically relates to threats against public officials.  Second, courts have made it clear that the "official-victim enhancement 'is designed to protect government officers in the performance of their duties.'"  *See* United States v. Davila-

Bonilla, 968 F.3d 1, 10-11 (1st Cir. 2020) (*citing* United States v. Watts, 798 F.3d 650, 655 (7th Cir. 2015)(Posner, J.)).   As such, Section 115(a)(1)(B) and § 3A1.2(a)(1) most commonly apply to defendants whose threats actually reach or at least were reasonably calculated to reach the official victim and had the potential, therefore, to impact the performance of their duties.   That simply did not occur in this case.   There is no evidence that Mr. Meredith's threat caused any disruption of any governmental function – in fact, there is no evidence that his threat was ever even communicated to Speaker Pelosi.   PSR at ¶21.

### 2.   The History and Characteristics of the Defendant

There is no question that the history and characteristics of Mr. Meredith support a sentence of time-served.   First, Mr. Meredith has had a life of great promise and accomplishment.   He has been a dutiful father.   He has recognized his need for mental health care and sought it in the past. He has shown ambition and success in his business endeavors.   But perhaps most importantly, he has shown determination and resilience in recovering from past challenges and failures, a determination he can now put to use in repairing his shattered life.   Mr. Meredith should be given a chance to repair his situation and return to the man he once was.

Second, despite the very challenging circumstances of his confinement, made all the more difficult by severe pandemic restrictions, Mr. Meredith has been able to make the best of this situation – a further testament to his resilience and demonstrated aptitude for rehabilitation.   The enclosed Work Performance Rating – Inmate Form from the DC Department of Corrections rates Mr. Meredith as "Excellent" in all categories, including "Initiative" and "Response to Supervision" and notes: "Cleveland has been on detailed assignment longest in the unit. Cleveland definitely has no behavioral or security concerns."   Exh. 4, DC Department of Corrections Work Performance Rating – Inmate. Sergeant Shawn Franklin, C Building Zone Supervisor at the Correctional Treatment Facility, asserts the following about Mr. Meredith:

Inmate Cleveland Meredith DCDC 376-201 has been housed in the housing unit C2B since entering the Correctional Treatment Facility. Inmate Cleveland, Meredith has been an outstanding contribution to CB2 since being assigned to the housing unit and the detail squad. His natural leadership ability has been steadfast and unwavering. Inmate Cleveland gives 100% effort in every assignment that is given to him. Since entering the Correctional Treatment Facility Cleveland hasn't had any adverse action or any Disciplinary Reports for negative institutional behavior, in fact Inmate Cleveland consistently shows positive institutional behavior with all staff and the entire inmate population assigned to the housing unit CB2. Inmate Cleveland is a mentor that is used daily by uniform and non-uniform staff assigned to the housing unit. Inmate Cleveland has been many assignments with little to no supervision. Inmate Cleveland is a morale booster, counselor amongst the Inmate Population assigned to the housing unit C2B, his ability to quarrel disputes between others inmate's is outstanding. I recommend that Inmate Cleveland be given the next position based off of his excellent work ethic and his ability to continue to display his positive institutional behavior.

Exh. 5. Ltr. from Sgt. Franklin (emphasis in original).

A letter from a fellow inmate, Robert Moss, explains that Mr. Meredith has provided much needed moral support within the CTF unit:

Cleveland Meredith was the first person to take me under his wing and uplift my spirits. As I entered CB2, he could probably tell my attitude was at an all time low. Due to Cleveland's selfless character, he didn't hesitate to provide words of encouragement to myself or the two other individuals I arrived with. As my two month mark is approaching of being a resident of C2B, I have observed that not only is Cleveland a hard working, attention to detail kind of employee, he is also the moral Rock of this cell block. Cleveland insistently goes out of his way to ensure that everyone in this cell block is ok! He is willing to go out of his way to build others up with his kind encouragement. He is also willing to make himself the butt of the joke for the sake of someone else's happiness. Cleveland is a selfless individual who will not only make sure you get your commissary or your tablet or the surfaces are clean/sanitized, he is also the one who will ensure that your morale is better after a visitation with him than when he first approached you with a smile[.] Cleveland is a good man. Thank you for your time. – Robert A. Moss

Exh. 6, Ltr. from R. Moss.

Third, at age 53, and with the responsibility of being a father on his shoulders, Mr. Meredith has every incentive to abide strictly by whatever terms and conditions of supervised release this Court imposes.  Exh. 2, Report by S. Xenakis, MD at 9 (noting importance of being a father to his sons as incentive to Mr. Meredith to abide by terms of supervised release).  And Mr.

Meredith has the stalwart support of his family to ensure that he stays true to the path he must now follow.

Fourth, while Mr. Meredith has mental health challenges that he must confront, he is competent, intelligent and clear-eyed in knowing what he must do – he is not the "deranged and dangerous" person depicted by the Government.   Government Memorandum in Support of Pretrial Detention at 9.   Indeed, Dr. Xenakis believes that Mr. Meredith, with the stabilizing effect of comprehensive mental health care and appropriate medications, will be able to repair his life without posing a threat to himself or others or without repeating the conduct that placed him into his current predicament.   The key, as Dr. Xenakis has opined, is that Mr. Meredith disengage from the corrosive online and political influences that caused him to commit the instant threat, focusing instead on the hard work of making up for the lost time with his sons and family and of building the new business venture that he already has started.   Exh. 2, Report by S. Xenakis, MD at 9, 11.

Fifth, those who know Mr. Meredith best have attested to his good character, to the man he was, and is, capable of being.   His father is gravely ill and cannot travel to attend the sentencing but has provided a letter to the Court that aptly summarizes his view of his son:

> Cleve's mother and I find it difficult to believe that we are sitting here in your court room taking part in a sentencing hearing for our son, Cleveland Grover Meredith, Jr. Cleve is proud to be an American! He is a passionate American! He was at a very vulnerable time in his life when he was drawn into the rhetoric and the lies of conspiracy theorist groups. The impact these groups had on Cleve changed him from an incredibly kind man, an empathetic man, an energetic and athletic man and especially the moral man who held and exhibited the highest of values for all mankind. He's the guy always pulling for the underdog, the less fortunate. There are too many examples of his kindness and compassion for others to share … This is the boy/man we know. To this day he will stop to help a stranded citizen.

<div align="center">

\*

\*

\*

</div>

He is the son, the brother, the grandson, the nephew, the uncle, the cousin, who we could always count to fill the room with laughter and joy. He is well loved. We all want him to be well.

He is an adoring father to his boys and he has shown great remorse and regret how his actions have impacted them. These two incredible young men need their father in their lives.

Your Honor, speaking as one parent to another, I beg you to consider an alternate situation other than incarceration for our son. We wholeheartedly trust that Cleve will make the appropriate reparations if he is granted the opportunity to receive mental health counseling and treatment for the underlying issues that have impacted his mental health.

Exh. 7, Ltr from C.G. Meredith, Sr.

Mr. Meredith's sons, Taft and Teddy, speak in their letters to the father they need back in their lives.  Exh. 8, Ltrs from Taft and Teddy Meredith.  Mr. Meredith's aunt, uncle and sister also attest to his good character and potential for rehabilitation.  Exh. 9, Ltrs from D. Smith, D. Wilson and A. Schneider.  Wendy Meredith, Mr. Meredith's mother, and various friends of Mr. Meredith plan to address the Court directly at sentencing.  Each of them knows that "Cleve" has lost his way but can find his way back, and each stands ready to provide whatever support to him may be needed.

Lastly, Mr. Meredith deeply regrets his actions, the disruption and fear his words had the potential of creating with Speaker Pelosi and the harm and embarrassment his conduct has caused his family and those who have believed in him.

### 3.  A Sentence that Reflects the Seriousness of the Offense

There is also no question that a sentence of time-served would reflect the seriousness of this offense and provide just punishment.  18 U.S.C. § 3553(a)(2)(A).  If sentenced to time-served, Mr. Meredith would end up serving close to a year in jail for sending a threat contained in a text to a family member.  This is not, in other words, a situation where Mr. Meredith attempted to spur rampant fear or alarm by posting his threat in ominous language in a public

posting or in a communication directly with an official, a situation that might call for a higher sentence.  Nor is this a situation where Mr. Meredith caused substantial disruption of already overburdened law enforcement resources.  Rather, he made a stupid, ugly, extremely vulgar threat via a text to a family member.  A year in jail for such an offense is certainly sufficient to communicate just how seriously threats of any kind are taken by the judicial system.

A sentence of time-served would also no doubt serve to deter Mr. Meredith from engaging in repeat conduct.  No doubt, it has been especially arduous for this 53-year-old first-time offender to be held for over 11 months in the undeniably tough conditions of CTF in the midst of the additional confinement restrictions arising from the pandemic.  Mr. Meredith has come to fully appreciate, through this stark and dangerous experience, the consequences of his actions and the implications of any repeat conduct.   As he can attest at the sentencing hearing, there is no way he would risk a repeat of what he has had to endure over the past year of incarceration, much less losing more time with his boys before they head off from home into the world. Moreover, supervised release would entail a strict regimen of, for example, reporting to a probation officer, submitting monthly financial reports and mandatory drug testing, which would reduce the risk of re-offending.  Furthermore, others would understand from such a sentence the potentially dire consequences of any form of threat, no matter how and under what circumstance communicated, thereby promoting wider respect for the law and encouraging deterrence.

### 4.  A Sentence that Provides the Defendant with Needed Medical Care

Section 3553(a) recognizes that the Court should take into account any medical issues facing the defendant and whether the sentence imposed will "provide the defendant . . . with needed medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).  Indeed, the Court during the pretrial detention proceeding indicated sensitivity to Mr. Meredith's mental health issues: "I couldn't agree with the defense counsel more, that there needs to be some significant

overarching therapeutic regimen that covers the psychological issues he's been dealing with for a long time.  Not only the PTSD, the loss of his sister, the divorce, the disassociation with a group that has had a negative influence on him. There's a lot to discuss."  Transcript of Arraignment on March 26, 2021 at 59.  Mr. Meredith is committed to getting the help he needs.

As noted, the defense has retained Stephen Xenakis, M.D. to assess Mr. Meredith's mental health issues and opine on whether there are treatment modalities that would address these issues and ensure that Mr. Meredith does not re-offend or pose a danger to himself or others in the future.  Dr. Xenakis is ideally suited to conduct such an assessment – he is a retired Brigadier General in the U.S. Army with decades of experience addressing the most challenging and severe of mental health issues afflicting combat soldiers and others, like Mr. Meredith, afflicted with issues arising from, or related to, PTSD.  Dr. Xenakis thus understands how to tackle extreme ideological views with disengagement strategies; how to structure comprehensive treatment and medication management modalities; how to carefully monitor progress under such modalities to ensure compliance.  Exh. 2, Report by S. Xenakis, MD (attaching CV).

In his report, Dr. Xenakis opines, *inter alia*, (1) that Mr. Meredith was profoundly affected by the death of his younger sister; (2) that his involvement with QAnon coincides with the period in his life when he was struggling with the effects of a failed marriage and business; (3) that, while reactive to feeling threatened, he has not shown a history of intentional violence or any deliberative attempt to inflict harm on other; (4) that his prior incidents of reactive outburst can be correlated to his use of ████████████████████████████████████ (5) that he has not, to date, received an appropriate comprehensive neurological assessment of his troubling mental health conditions; and (6) that he has shown a clear willingness to engage in a mental health treatment program upon release.  Exh. 2, Report by S. Xenakis, MD.  Dr. Xenakis summarizes his findings as follows:

> In short, I believe, to a reasonable degree of medical certainty, that Mr. Meredith has significant underlying mental health, medication and concussion related issues that contributed to the events at issue; that there is no indication, based on my experience, that he intended to carry out any of his hyperbolic, threatening statements; that he has the capability and willingness to participate in an appropriate course of treatment to achieve disengagement and avoid further aggressive behavior; that he will not be a danger to himself or others if an appropriate treatment modality per above is pursued; and that he is capable, if he complies with such conditions, of returning to be the father, family member and contributing member of society that he once was.

Exh. 2, Report by S. Xenakis, MD at 13.

Significantly, Dr. Xenakis finds that Mr. Meredith has never been provided the kind of comprehensive mental health assessments and treatments that he has so desperately needed and, to make matters worse, has been using medications that are not simply contra-indicated but, in fact, conducive to the sort of uncontrolled and ill-considered conduct at issue. *Id*. at 8. Accordingly, Dr. Xenakis has developed a comprehensive, highly structured, multi-prong mental health treatment plan for Mr. Meredith which will help ensure that he does not engage in similar conduct again. *Id*. at 10-13. In doing so, Dr. Xenakis has identified and conferred with top-notch mental health care professionals in the Atlanta area who are willing to provide to Mr. Meredith the various forms of treatment needed to address his ███████████████

███████████████████████████████

███ *Id*. These include Dr. Galen Cole, who previously treated Mr. Meredith, and Dr. David Cantor of Atlanta who would coordinate testing and evaluations ███████████ ███████████ arrange for neuropsychiatric assessment for prescriptions of medications and/or treatment ████████████ and provide counseling and cognitive behavior therapy to support disengagement from extremist activity. *Id*. at 11. Clearly, additional imprisonment is not needed in order to provide this necessary mental health care, as Mr. Meredith can arrange care from these mental health professionals, at his own expense, outside the federal prison system. *See, e.g.*, United States v. Alatsas, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008)

(imposing a term of probation, despite Guidelines range of 24-30 months where, *inter alia*, "[d]efendant has multiple complex medical problems, which will be better cared for outside of prison.").

In addition, there is statistically decreased risk of recidivism in this case given Mr. Meredith's age. *See, e.g.*, United States v. Smith, 275 F. App'x 184, 187 (4th Cir. 2008) (affirming 54 months downward variance in part because of low risk of recidivism). Statistical data from a study commissioned by the United States Sentencing Commission show that "[r]ecidivism rates decline relatively consistently as age increases." U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12.[38] The study indicates that a defendant over the age of 50 in criminal history category I, like Mr. Meredith, has only a 6.2 percent likelihood of recidivating. *Id.* at Ex. 9.[39]

### 5. The Need to Avoid Unwarranted Disparities

A critical sentencing factor in this case is the need to avoid disparities with the sentences imposed in similar cases. 18 U.S.C. § 3553(a)(6). The types of sentences imposed in threats cases in the District and beyond are thus instructive and appropriately considered by the Court. *See, e.g.*, United States v. Doan, 498 F. Supp. 2d 816, 820 (E.D.Va. 2007) ("This Court does not dispute the value in looking nationwide to similarly situated criminal defendants of similar culpability that have committed similar acts resulting in similar convictions with similar backgrounds and with similar records under similar circumstances."). As set forth below, the sentences imposed in decidedly more egregious matters involving threats have been in the range of probation to 19 months of incarceration:

- *United States v. Troy Smocks*, 21-CR-198 (D.C.D.): The defendant in this matter traveled to Washington D.C. on January 5, 2021 and, on the morning of the Capitol Riots, he posted a message on social media "containing a threat to injure law enforcement officers" that reached "tens of thousands of users" from an account that falsely purported to identify the defendant as a retired military officer. ECF No. 59, Government's Sentencing Memorandum, 1–2 (emphasis added). The message

threatened that "millions" would "return on January 19, 2021, carrying Our weapons[.]" *Id.* at 2. After the Capitol Riot, the defendant sent "another threatening message on the social media service" that was "again viewed by tens of thousands of other users," threatening to "hunt down" and murder "RINOS, Dems, and Tech Execs" "over the next 24 hours." *Id.* at 3. According to the government, "defendant has a lengthy criminal history, with approximately 18 prior criminal convictions spanning from the early 1980s to 2006." *Id.* at 6.

The defendant pled guilty to one count of transmitting threats to injure, § 875(a). *Id.* at 1. The government agreed that the defendant was subject to base offense level 12, with no enhancements, and that he was subject to a guideline range of 8 to 14 months or 10 to 16 months depending on his criminal history category. *Id.* at 4. The government took the position that "a term of imprisonment at the low end of the Sentencing Guidelines range," either 8 months or 10 months, was sufficient. *Id.* The defendant was ultimately sentenced to 14 months of imprisonment and 3 years of supervised release. Minute Entry dated October 21, 2021.

- *United States v. Dawn Bancroft*, 21-cr-00271-EGS-1 (D.D.C.): The defendant in this matter participated in the U.S. Capitol Riot on January 6, 2021 and entered the building through a window. *See* Complaint, ECF No. 1. Upon exiting, the defendant filmed a video in which she stated, "We broke into the Capitol…we got inside, we did our part.' BANCROFT continued, 'We were looking for Nancy to shoot her in the friggin' brain but we didn't find her.' [The complaint] affiant believe[d] that the 'Nancy' BANCROFT was referencing is Speaker of the House, Nancy Pelosi." Despite having threatened to kill Speaker Nancy Pelosi while standing on the very steps of the U.S. Capitol, the defendant *was never charged* with threatening to harm a federal official.  Instead, she was permitted to plead guilty to unlawfully Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G), a misdemeanor that carries a maximum sentence of six months in prison. She is currently out on bond and scheduled for sentencing in February 2022.

- *United States v. Lucio Celli*, 19-CR-127 (E.D.N.Y.): The defendant in this matter sent multiple emails to the Honorable Chief Judge Margo K. Brodie, the Honorable Brian M. Cogan, and the late Honorable Robert A. Katzmann, threatening to kill them. ECF No. 175, Government's Sentencing Memorandum, 1–2.  He was arrested after sending at least four more emails to Judges Brodie and Cogan and other individuals "promising" and threatening to "hunt down and kill" them.  *Id.* at 2.

The defendant pled guilty to one count of transmitting threats to injure, 18 U.S.C. § 875(c), after years of changing lawyers and the filing of pretrial motions. *Id.* at 1. Although the Guidelines recommended a sentence of 24 to 30 months, the government agreed that a sentence of time served (4.5 months of incarceration) and two years of supervised release was appropriate. *Id.* at 3–4. The defendant was sentenced consistent with the government's recommended sentence.  ECF No. 178.

- *United States v. Niviane Petit Phelps*, 1:21-cr-20240-JEM (S.D.F.L.): Per the Government's Factual Proffer, the defendant in this matter sent six videos to her

imprisoned husband through the application JPay. On February 13, 2021, the defendant recorded two 30-second videos depicting herself threatening to kill Vice President Kamala Harris. In the first of these videos, the defendant said, "Kamala, you are going to die. Your days are numbered already. Someone paid me $53,000 just to fuck you up." In the second video, the defendant stated, "Kamala Harris put a dime on me. I put a dime back on her. $53,000 that's your fucking number. It's on your fucking head bitch." The next day, on February 14, 2021, the defendant filmed two additional videos.

On February 18, 2021, the defendant recorded two more videos threatening to kill Vice President Harris.  In the first, she stated: "50 days from today you will die… Vice President Kamala Harris you will fucking die 50 days from today… 53,000. I'm the hit man." In the second, she stated: "and fucking Kamala Harris I swear to god, today is your day, you gonna die. 50 days from today, mark this day down, you stupid bitch, Kamala fucking Harris vice president, you gonna fucking die 50 days from today." Two days later, on February 20, 2021, the defendant sent a photo of herself holding a firearm at a gun range. On February 22, 2021, the defendant applied for a concealed weapon permit. On March 6, 2021, the defendant admitted having knowledge that someone else could potentially see her videos, but stated that she did not care. She also stated that she does not know what would have happened if law enforcement had not shown up.

The defendant pled guilty to six counts of threats against the vice president, 18 U.S.C. § 871. The defendant was ultimately sentenced to 12 months and one day of imprisonment, followed by three years of supervised release. Minute entry dated November 23, 2021.

- *United States v. Brendan Hunt*, 1:21-cr-00086-PKC (E.D.N.Y.): Per the Government's Sentencing Memoranda, the defendant in this matter recorded and uploaded an 88-second video on January 8, 2021, titled "Kill Your Senators," in which he stated the following:

> [W]e need to go back to the U.S. Capitol when all of the Senators and a lot of the Representatives are back there and this time we have to show up with our guns and we need to slaughter these motherfuckers. What I'm saying is that our government at this point is basically a handful of traitors, so what you need to do is take up arms, get to DC probably the inauguration . . . that's probably the best time to do this, get your guns, show up to D.C., and literally just spray these motherfuckers. Like, you know, that's the only option. They're gonna kill us. So we have to kill them first. So get your guns. Show up to D.C.; put some bullets in their fucking heads. If anybody has a gun, give me it, I will go there myself and shoot them and kill them. We have to take out these Senators and then replace them with actual patriots. Basically, I would trust anybody over them at this point uh this is a ZOG [Zionist occupied] government.

Later that day, he posted a message on Parler stating "… enough with the 'trust the plan' bullshit. lets go, jan 20, bring your guns . . ." Prior to this, on November 27, 2020, the defendant posted a message to Facebook stating, "Like ive been saying all along, biden will NEVER set foot in the white house. we will mow down any commies who try to run a coup on america! MAGA!" He posted an additional video to Facebook on December 6, 2020.

The defendant was convicted by a jury of one count of threatening to murder members of Congress in violation of 18 U. S. C. § 115(a)(l)(B) and §115(b)(4). The defendant was ultimately sentenced to 19 months of imprisonment, followed by three years of supervised release. Minute entry dated November 22, 2021. The defendant was subject to a special assessment fee of $100 but no fine.

- *United States v. James Dale Reed*, No. 20-CR-406 (D. Maryland): The defendant in this matter delivered letters to homes with Democrat signs that included graphic death threats against U.S. President Joe Biden and Vice President Kamala Harris when they were candidates during the 2020 campaign. ECF No. 35, Government's Sentencing Memorandum, 2.  The letters also threatened to murder any "Biden/Harris supporter[s]" and their children in their homes. *Id.*  The defendant was known to the U.S. Secret Service for having emailed a nonprofit organization several times in 2014 with death threats against then-President Obama, Michelle Obama, former New York Governor Andrew Cuomo, and former New York City Mayor Michael Bloomberg. *Id.*at 5. Around the time he made the threats, the defendant traveled to Gettysburg, PA on the same day as then-candidate Biden. *Id.* at 3. During a search of the defendant's home, the defendant's "M4, 9mm S&W pistol, Highpoint 9mm rifle, and 12-gauge shotgun were seized along with eight canisters  of ammunition for these weapons." *Id.* at 4.  The defendant was also in possession of grenades, military gear, "a highlighted list of attendees at a conference about 10 years ago (many of whom are/were U.S. government protectees), and a hand-drawn map of Frederick Police Department Special Response Team tactical responses." The government believed his possession of these items "show[ed] an ability to carry through on his threaten [*sic*] behavior." *Id.*

The defendant pled guilty to making a Threat to a Major Candidate for the Office of the President or Vice-President, 18 U.S.C. § 879. The government recommended "[a] sentence of eighteen months followed by a three-year term of supervised release." *Id.* at 5. The defendant w a s ultimately sentenced to 7 months in prison and three years of supervised release. ECF No. 37. The sentence was consecutive to four months the defendant served in state custody for the same conduct.

- *United States v. Brogan*, No. 19-CR-00207-NGG (E.D.N.Y.): The defendant in this matter called the office of a sitting United States Senator and left a lengthy voicemail calling her a "stupid bitch" and repeatedly stating that he would "put a bullet in [her]" and "light her up with [] bullets" because of her views on abortion. ECF No. 21, Government's Sentencing Memorandum, 1–2. "The voice message also ma[de] explicit reference to Defendant Brogan's potential travel to Washington, D.C., a fact that is made more alarming by a past social media post discussing a previous" trip to

the nation's capitol and, as discussed above, a potential future trip to Washington, D.C. the next month." *Id.* at 4. The government's investigation confirmed that he had recently traveled to Washington D.C. twice. *Id.* at 2. The defendant's criminal history included at least five arrests and two convictions, including one where he traveled to a woman's home after a traffic accident, tried to extort her, and then assaulted her husband. *Id.* at 4–5.

The defendant pled guilty to one count of threatening to murder a federal official, § 115(a)(1)(B) and the government recommended a sentence of 6 to 12 month's imprisonment. *Id.* at 3. The defendant was ultimately sentenced to three years of probation. ECF No. 27, Judgment.

- *United States v. Kao Xiong*, 18-CR-00235 (E.D. Ca.): The defendant in this matter " mailed over 150 threats and/or hoax letters targeting the United States President (POTUS), a Federal Law Enforcement Officer (FLEO), family of POTUS and a FLEO, FBI Offices, State Agencies, private businesses and civilians since January 2017.  The hoax/threat letters included death threats, bomb threats, assassination, extortion demands, and white powder." ECF No. 1, Complaint. Many of the letters reached their intended recipients, and caused serious disruptions to the White House, airports, companies, law enforcement. *Id.* "Each of the letters sent to a former POTUS required substantial law enforcement resources to properly assess, document, and preserve the evidence." *Id.* The defendant continued sending threatening communications after being interviewed by the U.S. Secret Service and being asked to stop.

The defendant pled guilty to Conveying False Information Concerning Use of an Explosive, 18 U.S.C. § 844(e). ECF No. 46, Plea Agreement. The government agreed he was subject to a total offense level of 12, *id.*, which resulted in a guideline range of 10 to 16 months. The government "recommend[ed] that the Court sentence defendant to a sentence at the low-end of the guideline range" and "that the Court impose a split sentence as permitted by U.S.S.G. § 5C1.1(d)(2), allowing the defendant to serve part of his sentence on home detention." ECF No. 50, Government Response to Presentence Report. The defendant was ultimately sentenced to time served (five months) and five months on home detention, followed by three years of supervised release.

- *United States v. Partick Carlineo*, No. 19-CR-6140 (W.D.N.Y.): The defendant in this matter contacted the office of Congresswoman Ilhan Omar and "[d]uring the ensuing conversation with a staff member, the defendant asked if the staff member worked for the Muslim Brotherhood, called Congresswoman Omar 'a fucking terrorist,' and threatened to 'put a bullet in her fucking skull.'" ECF No. 44, Government Sentencing Memorandum, 1–2. When the FBI went to his home, the defendant—a convicted felon—admitted he "illegally possessed six firearms and hundreds of rounds of ammunition." *Id.* at 7.

The defendant pled guilty to one count of threatening to murder a federal official, § 115(a)(1)(B). In its sentencing submission, the government noted that "it is troubling

that the defendant—who, in addition to this case, has other criminal convictions involving threatening and/or harassing behavior []—possessed a cache of firearms and ammunition." *Id.* The government nevertheless recommended a sentence within the advisory guideline range of 12 to 18 months. *Id.* at 3. The defendant was ultimately sentenced to a year and a day and 3 years of supervised release. ECF No. 70.

In view of these sentences in similar cases, sentencing Mr. Meredith to a period of incarceration beyond time served would create an unwarranted disparity in the sentencing treatment of other defendants in threats cases. *See* 18 U.S.C. § 3553(a)(6). This factor alone weighs heavily in favor of a sentence of time served for Mr. Meredith.

### 6.   The Need to Provide Restitution to Any Victims of the Offense

Per the Plea Agreement, the Government did not indicate an intent to request that a fine be imposed. *See* Plea Agreement at 4. Probation has calculated that Mr. Meredith is subject to the various potential ranges of fines under the Guidelines. PSR at ¶102. In any case, a fine, on top of any period of incarceration, is unwarranted for several reasons.

First, there is no need to pay any restitution to the putative victim of this threat, Speaker Pelosi, as there is no evidence that Speaker Pelosi suffered any economic or other impact from Mr. Meredith's conduct. In fact, there is no evidence that Speaker Pelosi was even made aware of his threat during the relevant period, much less that she or the Government took steps that had an economic impact in response to same. PSR at ¶21. In short, there was no tangible impact from Mr. Meredith's conduct that would provide the basis for restitution via a fine.

Second, while Mr. Meredith has personal savings, he nonetheless would stand in a precarious position economically upon release as he will need to struggle to rebuild his life and provide adequate financial support to his two boys. PSR at ¶¶85-98. Mr. Meredith will have no job to return to, no source of income on the horizon. And he will find it extremely difficult to find appropriate employment, given the fact of his felony conviction in this matter and the extensive negative attention his case has received in the media – Googling his name results in

hundreds of articles, many quoting the Government's early (and irresponsible) assertion that Mr. Meredith is "dangerous and deranged." Government Memorandum in Support of Pretrial Detention at 9. Moreover, when arrested, Mr. Meredith was in the process of transforming his property in North Carolina into a venue for a motorcycle training and touring business, a substantial undertaking that will require about $200,000 in additional personal investments by Mr. Meredith to get the business up and running. PSR at ¶76. Imposing a fine would simply cripple his already tenuous ability to get his life back in order, as well as his ability to provide for his children, both on the brink of attending university.

### 7. The Kinds of Sentences Available

There is no mandatory minimum sentence for this offense, so all sentences are available, including a sentence of time-served, followed by a significant period of supervised release. *See* 18 U.S.C. § 875. Moreover, the Court has the authority and discretion to impose a wide range of alternatives to the term of incarceration contemplated by the Guidelines, including home detention with electronic monitoring. *See* 18 U.S.C. §§ 3553(a)(3) and 3561(a)(1). The Court may also impose strict conditions of supervised release, to include stringent mental health treatment requirements, as well as a strict regimen of reporting to a probation officer, submitting monthly financial reports and mandatory drug testing. Furthermore, Mr. Meredith would have to relinquish his weapons and report any change in his residence or employment, all of which would significantly decrease the likelihood of recidivism.

### VI.    CONCLUSION

Mr. Meredith stands ready to seize back his life – for his boys who need their father; for his own father, who is in precarious health; for his family members who continue to support him; for his friends who know the good he is capable of; and, perhaps most of all, for his own sense of self worth. Mr. Meredith's clear need for mental health treatment, together with his age and

vulnerability to abuse if further confined, weigh strongly in favor of a sentence of time-served with stringent release conditions, a sentence that also appropriately reflects the nature of the instant offense, constitutes just punishment, fits the seriousness of the crime and avoids unwarranted disparities.

For all of the foregoing reasons, Defendant Meredith requests that the Court impose a sentence of time served followed by three years of supervised probation with terms and conditions that will help ensure that he is under appropriate mental health care and will not re-offend.

<div style="margin-left:40%">

Respectfully submitted,

KIYONAGA & SOLTIS, P.C.

/s/ Paul Kiyonaga

_____
Paul Y. Kiyonaga
D.C. Bar 428624
Debra Soltis
D.C. Bar 435715
Marcus Massey
D.C. Bar 1012426
1827 Jefferson Place, NW
Washington, D.C. 20036
(202) 363-2776
pkiyonaga@kiyosol.com
*Counsel for Defendant*

</div>

December 8, 2021

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of December, 2021, a true and correct copy of the foregoing Redacted Version of Defendant Meredith's Memorandum in Aid of Sentencing was served via the ECF system on the on the following attorneys for the Government:

> AUSA Anthony L. Franks
> DOJ-USAO
> 111 S. 10th Street Rm. 20.
> St. Louis, MO 63102
> Email: anthony.franks@usdoj.gov


> /s/ Paul Y. Kiyonaga
> _____
> Paul Y. Kiyonaga